IN THE UNITED STATES BANKRUPTCY COURT FOR THE WESTERN DISTRICT

OF NORTH CAROLINA CHARLOTTE DIVISION

| | | |
|---|---|---|
| IN RE:  VINROY W. REID | ) | |
| | ) | CHAPTER 13 CASE NO.: 18-31436 |
| DEBTOR | ) | |
| Y2 YOGA COTSWOLD, LLC | ) | ADV. PROC. NO.: 19-03049 |
| Plaintiff | ) | |
| V. | ) | |
| VINROY W. REID,  V.R. KING | ) | |
| CONSTRUCTION, LLC | ) | |
| A. BURTON SHUFORD | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT, VINROY W. REID'S
MOTION TO DISMISS, MOTION FOR JUDGMENT ON THE PLEADINGS AND
IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT**

<u>**JURISDICTION**</u>

**COMES NOW** Defendant, Vinroy W. Reid, by and through his counsel and pursuant to

Federal Rules of Civil Procedure 12(b) and (c) and Rules of Bankruptcy Procedure 7012,  requests that

the Court Rule in his favor on his  Pleadings.  In the alternative, the Defendant requests that the Court

grant him Summary Judgment pursuant to  Rules of Bankruptcy Procedure 7056, and  Rule of Civil Pro-

cedure 56 (a), states in pertinent part, "A party may move for summary judgment, identifying each claim

or defense-or the part of each claim or defense-on which summary judgment is sought. The court shall

grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and

that the movant is entitled to judgment as a matter of law."

In the above-referenced matter, Defendant, Vinroy W. Reid outlines his claims or defenses to be made in support of the Motions as follows:

1. The Bankruptcy Court lacks jurisdiction to hear any matters related to the contract which was the basis of the State Court lawsuit pursuant to mandatory abstention and the order granting conditional relief from stay; Plaintiff's Third Claim For Relief should be denied or dismissed because Plaintiff has failed to state a cause of action upon which relief can be granted.

2. Plaintiff has no actionable indemnity claim under the contract because the indemnity claim applies to third party defendants rather than direct parties to the contract;

3. Plaintiff has no actionable claim for attorney's fees under the provisions of the indemnity clause which Plaintiff now seeks to have treated as a "reciprocal attorney's fees" provision pursuant to N.C.G.S. Section 6-21.6;

4. Plaintiff has no actionable indemnity claim for relief in the form of attorney's fees based on the Doctrine of Judicial Estoppel; and

5. Plaintiff has no actionable claim indemnity for attorney's fees based on the Doctrine of Equitable Estoppel.

## ISSUE ONE

The Court lacks Jurisdiction to any matters related to the contract which was the basis of the State Court lawsuit pursuant to mandatory abstention and the Order conditionally granting relief from stay; and Plaintiff has failed to state a cause of action upon which relief can be granted.

## DISCUSSION AND APPLICABLE LAW

Defendant alleges that on September 27, 2018, Y2 Yoga Cotswold, LLC (hereinafter, "Plaintiff" or "Y2") filed an "Emergency Motion for Relief from Stay For an Order Allowing Creditor Y2 Yoga Cotswold, LLC to Proceed with State Court Litigation: Motion for Mandatory Or Permissive Abstention" [Doc. #6] in Defendant Vinroy Reid's Chapter 13 Bankruptcy proceeding, Case No. 18-31436.

Defendant contends that based upon the Bankruptcy Court's "Order Conditionally Granting Plaintiff's Motion for Relief from Stay" (hereinafter MFRS ) this court lacks subject matter jurisdiction to hear any matters related to the contract which was the basis of the state court lawsuit. Defendant alleges that Bankruptcy Court was required to and did in fact abstain from hearing any matters related to the state court law suit based upon 28 U.S.C. § 1334(c)(1) or (c)(2).

Pursuant to 28 U.S.C. § 1334(c)(1) or (c)(2), Plaintiff asserted the following in its MFRS:(1) Plaintiff's motion was timely; (2) the State Court action could not have been commenced in Federal Court; (3) the issues were noncore; (4) Bankruptcy Court would not have had jurisdiction but-for the pending bankruptcy; (5) the State Court jury trial had begun prior to the filing of the bankruptcy; and (6) the action would have been timely adjudicated in state court as the state court trial lasted eight (8) weeks. As a result of Plaintiff satisfying all the prongs of 28 U.S.C. § 1334(c)(1) or (c)(2), Bankruptcy Court was statutorily required to abstain.

On October 31, 2018, Bankruptcy Court issued an order conditionally granting relief from stay in Chapter 13 Bankruptcy Case No. 18-31436 [Doc. #48]. In its "Order Conditionally Granting Relief From Stay "this Court made several findings of fact germane to Defendant's dispositive motions: (1) Y2's claim for relief in the state court litigation includes (but are not limited to) non-core breach of contract, fraud, fraudulent transfers, alter ego, piercing the corporate veil, conversion, unfair and deceptive trade practice and breach of fiduciary duty and (2) Y2 sought in its Motion For an Emergency Order  provisions **allowing Superior Court Judge Hoover to proceed with the jury trial as to all parties, including the Debtor, and to enter  a final judgment as to all parties with respect to all issues in the complaint** (emphasis added).

Bankruptcy Court reached several conclusions of law but of significant importance to Defendant's current  dispositive motions are based on the following conclusions of law: (1) the Complaint clearly concerns issues of state law and the expertise of this Court is not necessary; (2) modifying the stay will promote judicial economy; and (3) this Court can properly protect the

3

Bankruptcy Estate by requiring that the **enforcement of any judgment in favor of Y2  will be solely within the jurisdiction of Bankruptcy Court** (emphasis added).

Even more significant to Defendant's dispositive motions is the fact that based upon this Court's findings of fact and conclusions of law this court held the following:  **(1)  Y2's Motion for Relief should be and is hereby granted for the purpose of allowing Y2 to determine its claims, if any, in the state court litigation and (2)  to the extent that Movant obtains a judgment against the Debtor or any other Defendants, Movant is required to seek <u>enforcement of such judgment</u> through this court** (emphasis added).

As such, this Court's October 30, 2018 Order granting conditional relief from stay, and the November 1, 2018, Stipulation Conditionally Granting Relief From Stay in Chapter 11 Bankruptcy Case No.18-31635 [doc. #5] which incorporated the terms of the Order Conditionally Granting Relief from Stay, **specifically limited this Court's jurisdiction to enforcement of the State Court Judgment**(emphasis added).

Plaintiff's "Emergency Motion for Relief from Stay For an Order Allowing Creditor Y2 Yoga Cotswold, LLC, to proceed with State Court Litigation: Motion for Mandatory Or Permissive Abstention ," was filed based on the grounds that at the time the MFRS was filed with Bankruptcy Court, a jury trial had commenced in Mecklenburg County State Court against the Defendants Vinroy Reid and VR King Construction, LLC., (hereinafter, "Joint Defendants").

In its MFRS Plaintiff alleged that the state court claims for relief against the Joint Defendants were: breach of contract, fraud, fraudulent transfers, alter ego, piercing the corporate veil, conversion, unfair and deceptive trade practices and breach of fiduciary duty. Plaintiff in its MFRS sought Emergency Orders from this Court allowing Judge Hoover to proceed with the

4

State Court jury trial to issue a judgment as to all issues. Plaintiff argued that relief from stay should be granted for cause. Plaintiff cited the twelve factors for lifting stay as enumerated by the Ninth Circuit in *In re Tuscan Estates*, Inc 912 F.2d 1162, 1166 (9th Cir. 1990) as they related to the State Court trial.

Plaintiff alleged that the third, fourth, fifth, sixth, eighth, and ninth factors do not apply to the facts of this case but the remaining factors weighed heavily in favor of the court granting relief from stay. It should be noted that Plaintiff argued under the first factor, that "allowing the Movant to proceed in the State Court litigation will likely result in complete resolution of the issues as relates to Plaintiff's claim and status as a creditor." Plaintiff argued that under the second factor, "it does not appear that the state court litigation would interfere or prolong the Debtor's Chapter 13 bankruptcy case." However, Y2 (Movant) stated that it intended to seek a determination whether the bankruptcy should be dismissed.

Plaintiff argued that the seventh factor is also favorable to lifting the stay because doing so would not prejudice the interest of other creditors or interested parties. Plaintiff alleges under the tenth and eleventh factors, "the State Court litigation is substantially underway." Under the twelfth factor, the "balance of hurt" weighs in favor of lifting the stay for the Movant as lifting the stay does little harm to the Debtor as he is prepared for trial and represented by counsel. Plaintiff argued that based upon the above factors it had shown sufficient cause for relief from stay. Bankruptcy Court granted Plaintiff relief from stay for the **sole purpose of enforcing the judgment** (emphasis added).

Furthermore, Defendant argues that this Court lacks jurisdiction to award attorney fees pursuant to N.C.G.S. Section 6-21.6, because the statute requires the tribunal who rendered the

5

judgment to make certain findings of fact and conclusions of law in its Order granting attorney

fees. Since this Bankruptcy Court was not the tribunal conducting the state court trial this Court

does not have authority to grant attorney fees pursuant to the statute. N.C.G.S. 6-21.6 reads as

follows:

> (c) If a business contract governed by the laws of this State contains a reciprocal attor-
> neys' fees provision, *__the court or arbitrator in any suit, action, proceeding, or arbitra-
> tion involving the business contract may award reasonable attorneys' fees in accor-
> dance with the terms of the business contract.__* In determining reasonable attorneys' fees
> and expenses under this section, the court or arbitrator may consider all relevant facts and
> circumstances, including, but not limited to, the following:
> (1) The amount in controversy and the results obtained.
> (2) The reasonableness of the time and labor expended, and the billing rates charged,
> by the attorneys.
> (3) The novelty and difficulty of the questions raised in the action.
> (4) The skill required to perform properly the legal services rendered.
> (5) The relative economic circumstances of the parties.
> (6) Settlement offers made prior to the institution of the action.
> (7) Offers of judgment pursuant to Rule 68 of the North Carolina Rules of Civil Pro-
> cedure and whether judgment finally obtained was more favorable than such offers.
> (8) Whether a party unjustly exercised superior economic bargaining power in the
> conduct of the action.
> (9) The timing of settlement offers.
> (10) The amounts of settlement offers as compared to the verdict.
> (11) The extent to which the party seeking attorneys' fees prevailed in the action.
> (12) The amount of attorneys' fees awarded in similar cases.
> (13) The terms of the business contract.

Defendant avers that Plaintiff was well aware that the state court tribunal (Judge Hoover) would

not award attorney fees to Plaintiff based upon a contingency fee agreement contract that paid Plaintiff's

attorney fees in the amount of 45% of the monetary judgment awarded, especially when the Plaintiff al-

leged over eight (8) causes of action in an eight (8) week trial where Plaintiff was only successful on one

of these numerous causes of action. Plaintiff alleged breach of contract, fraud, fraudulent transfers,

alter ego, piercing the corporate veil, conversion, unfair and deceptive trade practices and breach

of fiduciary duty, and requested attorney fees and costs for each cause of action in its complaint.

Plaintiff was aware that in order for the tribunal conducting the trial to award attorney fees to the Plaintiff pursuant to N.C.G.S. 6-21.6, it would have to satisfy the criteria set forth under the statute. Judge Hoover would have had to make findings of fact and conclusions of a law in his order awarding attorney fees based upon the thirteen enumerated factors set forth in the statute which are listed on Page 6 of this Memorandum.

Defendant asserts that since Plaintiff was only successful on the breach of contract claim Judge Hoover would not have granted Plaintiff an award of attorney fees equal to 45% of the monetary judgment. Plaintiff, being cognizant of the aforementioned facts, chose to forego its right to request attorney fees pursuant to the contract at the state trial court level as required by statute, decided roll the dice and gamble that it could convince the Bankruptcy Court, a tribunal who was unfamiliar with the facts as they unfolded at trial, that Plaintiff is entitled to all of its attorney fees in excess of a quarter of a million dollars (45% of the judgment) for all of its causes of action alleged in the complaint.

It is important to note that in its motion for costs, Plaintiff cites N.C.G.S. Section 7-305, as the statutory basis for its claim for costs. Subsection D(3) of N.C.G.S. Section 7-305, specifically lists counsel fees a permissible cost. For some unknown reason, Plaintiff chose not to seek attorney fees in its motion for costs pursuant to N.C.G.S. Section 7-305D(3) as is customary at the conclusion of a trial in state court. The Bankruptcy Court, a tribunal unfamiliar with the facts, would not be privy to the facts and circumstances present in the state court trial record which led to Plaintiff's failure to proceed under this particular statute in its quest for attorney fees.

Plaintiff is hoping that the fact that it was unsuccessful on all of its causes of action except one, its breach of contract claim, will be overlooked by the Bankruptcy Court. Plaintiff has

7

strategically chosen to request attorney fees pursuant to a different statute, N.C.G.S. 6-21.6, in the Bankruptcy Court, a tribunal that did not conduct the trial and would not be privy to the state court record, because Plaintiff is betting on the fact that the Bankruptcy Court would be unfamiliar of the arguments, facts, procedures, and dynamics as they unfolded in the state court trial, the Bankruptcy Court would not be aware of what causes of action were unsubstantiated by the evidence, what claims and arguments made by Plaintiff's counsel during the trial, the weight of the evidence attributed to witness testimony, and whether any evidence, argument and testimony were superfluous and/or unnecessary. Plaintiff is aware that the Bankruptcy Court would not have been privy to the entire state court record to make the findings of facts and conclusion of law as required by N.C.G.S. 6-21.6. As such, Plaintiff has strategically chosen to manipulate both the state and the Bankruptcy Court, jeopardizing the integrity of the judicial system and prejudicing the Defendant, by bringing a complaint for attorney fees in Bankruptcy Court instead of the state court as required by N.C.G.S. 6-21.6., and as Plaintiff led the Bankruptcy Court to believe it would do in its MFRS. Plaintiff has brought its complaint for attorney fees based upon a state court judgment for breach of a contract that was fully litigated to its completion in state court.

Defendant asserts that the Bankruptcy Court, a tribunal unfamiliar with the state court proceeding, should dismiss Plaintiff's third cause of action in its complaint because this court lacks jurisdiction and/or Plaintiff has failed to state a cause of action upon which relief can be granted.

Based on the foregoing, Defendant requests that this Court grant his Motion filed on May 22, 2020.

**ISSUES TWO AND THREE**

1. Whether Plaintiff has an actionable indemnity claim under the contract between the parties? and

2. Whether Plaintiff has an actionable claim for attorney's fees under an indemnity clause which Plaintiff seeks to convert into a "reciprocal attorney's fees "clause pursuant to N.C.G.S. Section 6-21.6?

**DISCUSSION AND THE APPLICABLE LAW**

In *International Paper Company v. Corporex Constructors, Inc., 385 S.E.2d 553 (1989)* the court states that in examining the indemnity clause in the  contract between the parties the court **must** examine the contract itself (emphasis added).  The court goes on to state that "When a court is asked to interpret a contract its primary purpose is to ascertain the intention of the parties." *Lane v. Scarborough, 284 N.C. 407, 200 S.E.2d 622 (1973). "* A contract that is plain and unambiguous will be interpreted  by the court as a matter of law. Id. At 410, 200 S.E.2d at 624.  When an agreement is ambiguous and the intention of the parties is unclear, **interpretation of the contract is for the jury**." *Silver v. Board of Transportation, 47 N.C.App.261, 267 S.E.2d 49 )1980)* (emphasis added).

In the Court's ruling in *Crescent Univ. City Venture, LLC v. AP Atl, Inc. 2019 NCBC 46, Paragraph 90*  states that " …our Court of Appeals has discussed incidental damages as a separate category of damages available in common law breach of contract cases…" The court goes on to cite *J.T. Russell & Sons, Inc. v. Silver Birch Pond LLC, 217 N.C. App 290, 297-98, 721 S.E. 2d 699, 704-05 (2011),* and North Carolina's pattern jury instructions in support of its findings that "incidental damages may be awarded in a myriad of contract cases, including where the con-

tract in question relates to construction." The Crescent Univ. City Court goes on to state that

"The Restatement (Second) of Contracts, which North Carolina courts view as persuasive au-

thority on matters of contract law, also recognizes incidental damages as a distinct category."

N.C.P.I.-Civil 503.70, the Crescent City court also recognizes that "The right to incidental dam-

ages applies in almost every breach of contract setting(e.g., construction contracts…)"(Paragraph

90). North Carolina pattern jury instruction further provide examples of incidental damages to

include "costs reasonably incurred by the plaintiff in response to the Defendant's breach" and

"costs reasonably incurred by the plaintiff for the purpose of minimizing the injury resulting

from the defendant's breach."

Because the contract between Y2 Yoga and Vinroy W. Reid et al was a construction

contract and pursuant to the holdings of the court in the Crescent City case discussed above, **in-

demnity and contribution claims are derivative claims which apply to third parties rather

than the parties to the contract** (emphasis added).The Y2 Yoga indemnity clause states in per-

tinent part "Notwithstanding anything to the contrary contained herein the foregoing indemnity

**shall apply to those third party claims arising from General Contractor's oversight or neg-

ligence pertains to operation, legal and/or financial matters."** (emphasis added) ( See Con-

tract between the parties attached hereto as EXHIBIT A). It is clear from this wording in the Y2

Yoga and Reid contract that the indemnity clause is <u>not</u> ambiguous but instead, clear on its face.

Despite the clear language of the Indemnity Clause, Y2 Yoga now is attempting to con-

vert the Indemnity Clause into a Reciprocal Attorney's Fees Clause, in doing so, Y2 Yoga has

taken the indemnity clause which is clear on its face and is attempting to create an ambiguity to

enable it to now to seek to recover attorney's fees pursuant to N.C.G.S. Section 6-21.6.

The contract does not contain any "reciprocal attorney's fees clause nor in fact any attorneys fees clause at all. Under contract law, ambiguous terms shall be interpreted in the light most favorable to the non-drafting party. In the present case, Y2 Yoga was the drafting party so where there is an ambiguity, the court must interpret the ambiguity in the light most favorable to the Reid Defendants. Y2 Yoga when drafting the contract had the opportunity to include a specific "reciprocal attorney's fees or an attorney's fees provision in general; it failed to do so as required under the statute. If they had done so, and the Defendant had signed the contract containing this clear provision, Y2 Yoga would not have had to file an additional suit in Bankruptcy Court to attempt to collect its attorney's fees.

N.C.G.S. Section 6-21.6 provides for "reciprocal attorney's fees"in a business contract in certain situations. Section 6-21.6 ( C ) states: "If a business contract governed by the laws of this State contains a reciprocal attorney's fees provision, the court or arbitrator …in any suit, action, proceeding …. involving the business contract may award reasonable attorney's fees in accordance with the terms of the business contract."

N.C.G.S.Section 6-21.6(b) states that "Reciprocal attorney's  fees provisions in business contracts are valid and enforceable for the recovery of reasonable attorney's fees and expenses *only* if all of the parties to the business contract sign by hand the business contract." (emphasis added). Read together it is clear that under this statute section the only way that Y2 Yoga could recover attorney's fees is by including a "reciprocal attorney's fees provision in the contract that is clear on it's face so that the court will not be put into the position of having to examine the intent of the parties. In this case, because there is no specific attorney's fees provision, there is no unambiguous contract term, which was signed by both parties . Accordingly it is unclear

whether the parties each had the same intent.  Finally, N.C.G.S. Section 6-21.6(a) (4) requires

that a reciprocal attorney's fees provision  "must show that each party agrees in the manner set

forth in subsection (b) of this section, **upon the terms and subject to the conditions set forth**

**in the contract (applicable to all parties) to pay or reimburse the other parties for attor-**

**ney's fees and expenses incurred by reason of any suit, action, proceeding…involving the**

**business contract"**(emphasis added).

Because Y2Yoga is relying on the indemnity clause rather than a specific reciprocal at-

torney's fees clause, the intent of each of the parties is crucial to determine whether or not attor-

ney's fees as outlined under this state statute section apply.  Additionally, the clear language in

the indemnity provision as discussed above  states that the indemnity clause was applicable to

damages incurred as a result of a third party such as a subcontractor rather than an actual party to

the contract.

Under basic contract law an indemnity clause in the context of a construction contract is

intended to address third party issues rather than those of the parties to the contract.  In addition,

under North Carolina law, "[A] right to indemnify exists whenever one party is exposed to

liability by the action of another who, in law or equity, should make good the loss of the other."

*McDonald v. Scarbaro, 91 N.C. App. 13, 22, 370 S.E.2d 680, 686, review denied, 323 N.C. 476.*

*[*18], 373 S.E.2d 864 (1988);  see also, Cox v. Shaw, 263 N.C. 361, 139 S.E.2d 676 (1965); 41*

*Am. Jur. 2d Section 2, Basis for Indemnity , at 348.*  In an indemnity clause within a contract, a

party "engages to make good and save another harmless from loss on some obligation which he

has incurred or is about to incur to a third party." *New Amsterdam Cas.Co. v. Waller, 233 N.C.*

*536, 64 S.E. 2d 826 (1951). Under North Carolina law the legal effect of an indemnity clause is*

well established: *"Indemnity contracts are entered into to save one party harmless from some loss or obligation which it has incurred or may incur to a third party." Atlantic Contracting & Material Co., Inc. v. Adcock, 161 N.C. App. 273, 588 S.E.2d 36, 41 (N.C. Ct. App. 2003)*(emphasis in original); *see also Terry's Floor Fashions, Inc. v. Georgia-Pacific Corp., 1998 U.S. Dist. LEXIS 15392, 1998 WL 1107771, at *6 (E.D.N.C. July 23, 1998*(holding that generally an indemnity clause within a contract, one party "engage[s] to make good and save another harmless from loss on some obligation which he has incurred or is about to incur to a third party") (citing *New Amsterdam Cas. Co. v. Waller, 233 N.C. 536, 64 S.E.2d 826 (N.C. 1951* In Dixie Container Corp. v. Dale, the North Carolina Supreme Court was faced with a similar indemnity provision as is at issue here, and held: "We think it is reasonably clear that in the 'indemnify and save harmless' clause, defendant only bound itself to reimburse plaintiff for any damages it became obligated to pay third persons as a result of defendant's activity on the leased premises." *273 N.C. 624, 160 S.E.2d 708, 711 (N.C. 1968)*; see also *Smith v. Carolina Coach Co., 120 N.C. App. 106, 461 S.E. 2d 362, 366 (N.C. Ct. App. 1995)*.

There are different types of damages in contract law including "direct" and "indirect" both of which were awarded in the Y2 Yoga vs. Vinroy Reid et al State Court Proceeding.

In the Y2 Yoga v. Vinroy W. Reid et al case currently before this court, the attorney's fees sought would have been considered in the state court action decided by Judge Hoover as a question of fact, whether or not these costs were "incidental damages." The only way that Y2Yoga would have been entitled to recovery of attorney's fees is as a direct claim against Mr. Reid as a part of damages under N.C.G.S. Section 7A-305 which enables a party to recover "costs" in a civil action. Subsection (d)(3) of this section allows for "Counsel fees, as provided by law. In

it's Motion for Costs filed in State Court proceeding Y2 Yoga Cotswold, LLC v. Vinroy W. Reid et al (No. 16-CVS-23179),. Plaintiff chose not to pursue attorney's fees.  It sought costs only under subsections (1), (2),(4) and (5) of N.C. G.S. Section 7A-305. (See Motion For Costs attached hereto as EXHIBIT B )A final order was entered on that Motion so now they are seeking to recover these fees under N.C.G.S. Section 6-21.6 as discussed above.  They do not satisfy the statutory requirements of this Statue Section hence they should not be entitled to recover attorney's fees.  Bankruptcy Court is not the proper forum to take the testimony necessary to rectify the ambiguity in the contract between the parties.  N.C.G.S. Section 6-21.6 ( C ) states that " In determining reasonable attorney's fees and expenses under this section, the court or arbitrator may consider all relevant facts and circumstances, including but not limited to, the following:

 (1) The amount in  controversy and the results obtained;

 (2) The reasonableness of the time and labor expended and the billing rates charged by the attorneys;

 (3) The novelty and difficulty of the questions raised in the action;

 (4). The skill required to perform properly the legal services rendered;

 (5) The relative economic circumstances of the parties;

 (6) Settlement offers made prior to the institution of the action;

 (7) Offers of judgment pursuant to Rule 68 of the North Carolina Rules of Civil Procedure and whether the judgment obtained was more favorable than the offers of judgment;

 (8) Whether a party unjustly exercised superior economic bargaining power in the conduct of the action;

 (9) Timing of settlement offers;

 (10) The amount of settlement offers compared to the verdict;

 (11) The extent to which the party seeking attorney's fees prevailed in the action;

 (12) The amount of attorney's fees awarded in similar cases; and

 (13) The terms of the business contract.

Because the dispute between Y2Yoga and the Reid Defendants was removed to State Court for a jury trial pursuant to a Consent Order between the parties (See Consent Order attached hereto as EXHIBIT C) and because the Amended Complaint filed by Y2Yoga specifically asked for attorney's fees in connection with a finding of breach of contract, this was a question of fact which should have been heard and determined by the jury in the state court proceeding (See Amended Complaint attached hereto as EXHIBIT D).

The *Crescent City* Case cited previously in this Memorandum, the court cited *Stillwel l Enterprises, Inc. v. Interstate Equipment Co., 300 N.C. 286, 289, 266 S.E.2d 812, 814-15 (1980)* as referring to"the general rule …that a successful litigant may not recover attorney's fees, whether as costs or as an item of damages, unless such a recovery is **expressly authorized by statute**." (see Paragraph 171 of the Crescent City Case).

Based on the foregoing, Defendant requests that the Court grant his dispositive motions filed on May 18, 2020 (Doc. 46) and deny or dismiss the claims made based on these two issues.

## ISSUE FOUR – JUDICIAL ESTOPPEL

## DISCUSSION AND THE LAW

Defendant contends that Plaintiff's Third Cause of Action should be dismissed and/or denied based on the doctrine of Judicial Estoppel. Defendant asserts that Plaintiff is judicially estopped from alleging that it is entitled to attorney fees pursuant to the indemnity clause contained in the contract that Plaintiff implies is a reciprocal attorney fees provision. Defendant further contends that Plaintiff in it's MFRS sought Emergency Orders from this Court allowing Judge Hoover to proceed with the state court jury trial, to issue a judgment as to all issues. The Plaintiff in its MFRS specifically requested relief from stay to "PROCEED WITH THE STATE

COURT JURY TRIAL TO ISSUE A JUDGMENT AS TO ALL ISSUES." Plaintiff in the conclusion of

its motion for relief from stay pled the following " For the foregoing reason, the Movant respect-

fully requests entry of an order granting this Motion, providing Movant relief from stay to pursue

all claims in the state court litigation, including alter ego and veil piercing, or alternatively ab-

staining from such litigation, and for such other and further relief as may be just and proper."

Moreover, based on the pleadings and argument of counsel Y2 Yoga, the Debtor and

Spend Money Management Solutions, the Court in its Order Conditionally Granting Relief From

Stay made specific findings of fact as it relates to why the Court granted Plaintiff's Motion. The

Court found as follows: (1) Y2's claims for relief in the state court litigation include (but are not

limited to) non-core breach of contract, fraud, fraudulent transfers, alter ego, piercing the corpo-

rate veil, conversion, unfair and deceptive trade practices and breach of fiduciary duty; (2) Y2

sought in its Motion for an Emergency Order allowing Superior Court Judge Hoover to proceed

with the Jury trial as to all parties including the Debtor and to enter final judgment as to all par-

ties with respect to all issues in the complaint. Defendant asserts that the Plaintiff tendered a

copy of the contract as evidence at the trial and the jury reviewed the contract prior to beginning

deliberations. Defendant also asserts that the Plaintiff specifically requested interest, cost and

attorney fees in its complaint, as such Plaintiff is judicially estopped from requesting attorney

fees based on the indemnity clause in the contract when it informed the Court that it would re-

solve all issues in State Court. It is the Defendant's position that he relied on Plaintiff's represen-

tations to this tribunal and this Court should not now prejudice the Defendant by allowing the

Plaintiff the advantage of misleading this tribunal because it is now advantageous to do so.

In *New Hampshire v. Maine, 532 U.S. 742, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001)*, the

Supreme Court set forth a three-part test for when judicial estoppel should be applied. The Supreme Court stated that judicial estoppel should be applied if the following factors are present: (1) The parties later position must clearly be inconsistent with the parties earlier position; (2) the court was persuaded to accept the parties earlier position such that judicial acceptance of the inconsistent position in the later proceeding leads to the perception that one of the courts was misled; and (3) the party seeking to assert the inconsistent position would enjoy an unfair advantage over the opposing party if not estopped. *Id.* at 749-750.

The Fourth Circuit recently in *Matineau v. Wier 934 F.3d 385, 2019 WL 3772151, ar*6(4ᵗʰ Cir. 2019)* described the doctrine of judicial estoppel as follows:

> As the Supreme Court has explained, judicial estoppel is an equitable doctrine, designed to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment. *New Hampshire v. Maine, 532 U.S. 742, 749-50, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001)* (internal quotation marks omitted).

The Fourth Circuit ruling in *Matineau* stated: "typically, judicial estoppel is reserved for cases where the party to be estopped  has taken a later position that is clearly inconsistent with her earlier one; has persuaded a court to adopt the earlier position, creating a perception that either the first or the second court was misled; and would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. "

Finally, there is the longstanding principle that judicial estoppel applies only when the party who is alleged to be estopped intentionally misled the court to gain unfair advantage, and not when a party's prior position was based on inadvertence or mistake.  In the current case, the Defendant is not asserting that the Plaintiff intentionally misled this Court or the state court when it informed both courts that it was only going to state court to secure a judgment for all of its claims in its complaint and that upon securing a judgment it would go back to bankruptcy court for the sole purpose of enforcing the judgment. In *Spann v. Perry. 2019 U.S. Dist. LEXIS 181656,* the District Court in the Western District of North Carolina found that when a party argues in one proceeding that the statute of limitation is tolled a party cannot then argue in another proceeding that the statute limitation is not tolled. Id at 12. The District Court went

17

on to state that it does not suggest or imply that the Dr. Uhren intentionally misled the District Court to gain an unfair advantage. But Given, however, the Dr. Uhren's position during the closing hearing in Spann I, the District Court's reliance on that argument, Dr. Uhren's current arguments in this case, and the overall facts and circumstances, the undersigned believes that further development of the record, including additional information regarding the basis for the change in Dr. Uhren's position, is necessary before the issuance of a ruling on the merits of this issue.

Defendant asserts that like Dr. Uhren, Plaintiff cannot file a Motion for Relief From Stay on the grounds that it would only secure a judgment against the Defendant, causing removal of the case from the purview of Bankruptcy Court to then come back to bankruptcy court and argue that this Court should resolve outstanding issues that were alleged in the state court complaint. Defendant alleges that not only did the Plaintiff inform this Court of its intention of pursing a complete judgment of all issues in its complaint in state court, Plaintiff also informed the state court that it was pursuing resolution of all matters in its complaint as well. At the conclusion of the case based upon Plaintiff's pleadings, the state court used the following language in its judgment: "IT IS FURTHER ORDERED, that Plaintiff Y2 Yoga's costs of this action are taxed to the Reid Defendants based on this judgment upon separate application by Plaintiff Y2 Yoga. This judgment represents a complete and final disposition of all claims and issues in this action". **(see State Court Final Order attached hereto as Exhibit E).**

The *Matineau* case stated that "judicial estoppel is an equitable doctrine, designed to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment."

In the Y2 Yoga v. Reid case that is currently before the Bankruptcy Court, Plaintiff attempts to manipulate the judicial system by deliberately changing positions according to the exigencies of the moment. After the trial Plaintiff was well aware that the state court tribunal (Judge Hoover) would not award attorney fees to Plaintiff based upon a contingency fee agreement contract that paid Plaintiff's attorney fees in the amount of 45% of the monetary judgment awarded, especially when the Plaintiff alleged over eight (8) causes of action in an eight (8) week trial where Plaintiff was only successful on one of its many causes of action. Plaintiff alleged multiple causes if actions and requested attorney fees and

costs for each cause of action in its complaint. Plaintiff was aware that the provisions of N.C.G.S

6-21.6, under which Plaintiff contemplated seeking attorney fees, required Judge Hoover to

make findings of fact and conclusions of a law in his order awarding attorney fees based upon

the thirteen enumerated factors in the statute.

Since Plaintiff was only successful on the breach of contract claim and Judge Hoover was

intimately familiar with the facts of the case, Plaintiff knew Judge Hoover would not have

awarded Plaintiff attorney fees equal to forty-five (45%) percent of the monetary judgment.

Plaintiff, cognizant of the aforementioned facts, chose to forego its right to request attorney fees

after the state court trial, under any statute, pursuant to the contract. Plaintiff strategically chose

to roll the dice in Bankruptcy Court, a tribunal who was unfamiliar with the facts as they unfold-

ed in the record in the state trial court, and is now alleging in Bankruptcy Court that Plaintiff is

entitled to all of its attorney fees as alleged in its state court complaint. Plaintiff is now alleging it

is owes in excess of a quarter of a million dollars (45% of the judgment) in attorney fees, com-

pletely ignoring the fact that Plaintiff was unsuccessful on all of its causes of action except its

breach of contract claim. Defendant contents that Judge Hoover, after reviewing the trial court

record and analyzing the thirteen enumerated factors in the statute, would have denied Plaintiff's

claim for over $250,000.00 in attorney fees based upon the pleadings, testimony and entire

record of the state Court. Judge Hoover would have found that a contingency fee agreement

awarding Plaintiff's forty-five (45%) percent of the monetary judgment was far from reasonable

and unsubstantiated by the fact that Plaintiff was unsuccessful on seven out of its eight causes of

action.

Defendant contends that Plaintiff's third cause of action should be denied based upon ju-

dicial estoppel because the facts of this case fit the three enumerated factors espoused by the

Supreme Court in *In New Hampshire v. Maine*: *New Hampshire v. Maine*: (1) Plaintiff's position

that it is entitled to have the bankruptcy court determine whether it is entitled to attorney fees

pursuant to the contract is inconsistent with its earlier position that the state court is the proper

venue to hear any and all issues related to the contract; (2) Both courts were persuaded to accept

the Plaintiff's earlier position such that judicial acceptance of the inconsistent position in the lat-

er bankruptcy proceeding leads to the perception that one of the courts was misled as neither

court was put on notice during the hearing on the MFRS nor at any time prior to Plaintiff filing a

complaint in Bankruptcy Court, that Plaintiff would be seeking a determination of entitlement to

attorney fees in the Bankruptcy Court; and (3) the Plaintiff is seeking to assert that the Bank-

ruptcy Court can determine whether it is entitled to attorney fees as alleged in its complaint

which is inconsistent with its earlier position that the state court would be the proper venue to

determine all issues related to the complaint along with Plaintiff stating it would only seek en-

forcement of the judgment in the Bankruptcy Court. Defendant avers that Plaintiff's inconsistent

positions would allow Plaintiff to enjoy an unfair advantage over the Defendant if not estopped.

Based upon the foregoing, Defendant requests that this Court grant his motions filed on May 18,

2020, (Doc. 46).

## ISSUE FIVE– EQUITABLE ESTOPPEL
## DISCUSSION AND THE LAW

The Defendant asserts that the Plaintiff's third cause of action should be dismissed based

upon the Doctrine of Equitable Estoppel. The North Carolina Court of Appeals in *State Farm

Mut. Auto. Ins. Co. v. Atlantic Indem. Co.,* 122 N.C. App. 67, stated that a party invoking the doc-

trine of equitable estoppel has the burden of proving the following elements: (1) the conduct to

be estopped must amount to false representation or concealment of material fact or at least which is reasonably calculated to convey the impression that the facts are other than and inconsistent with those which the party afterwards attempted to assert; (2) Intention or expectation on the party being estopped that such conduct shall be acted upon by the other party or conduct which at least is calculated to induce a reasonably prudent person to believe such conduct was intended or expected to be relied and acted upon; (3) Knowledge, actual or constructive, of the real facts by the party being estopped; (4) Lack of knowledge of the truth as to the facts in question by the party claiming estoppel; (5) Reliance on the part of the party claiming estoppel upon the conduct of the party being sought to be estopped; (6) Action based thereon of such a character as to change his position prejudicially. *Id.* At 574-75

Defendant contends that based upon the factors enumerated in *State Farm Mut. Auto. Ins. Co. v. Atlantic Indem. Co.,* it has proven the elements of equitable estoppel and asserts the following: (1) the Plaintiff's conduct amounts to false representation or concealment of material fact which is reasonably calculated to convey the impression that the facts are other than and inconsistent with those which the Plaintiff is attempting to assert in Bankruptcy Court; (2) Plaintiff argued in Bankruptcy Court that the State Court was the best venue to conduct a trial on all of the issues alleged in its complaint including attorney fees and as such Defendant, the Bankruptcy Court and the State Court relied on Plaintiff's assertions; (3) After the state court trial Plaintiff became aware that its attorney fees would be severely limited by its failure to prevail on seven (7)of its eight (8) causes of action thereby substantially impairing its rights to collect attorney fees pursuant to N.C.G.S. § 6-21.; (4) Defendant contends it relied on Plaintiff's assertions that it would seek a judgment on all of its claims made in its complaint filed in State Court and that after it receiving its judgment in State Court that Plaintiff would return to Bankruptcy Court for the sole purpose of enforcement of the State Court judgment. Defendant was not aware that

Plaintiff would change its position as conveyed in its MFRS (See Motion for Relief attached hereto as Exhibit F) and the Bankruptcy Court's Order (See Bankruptcy Court Order on Motion for Relief filed in the Reid Corporate Defendants" Chapter 11 Case attached hereto as Exhibit G) and Stipulation Conditionally Granting the Motion For Relief From Stay and request the Bankruptcy Court determine the amount of attorney fees it should be awarded based upon its successful breach of contract claim; (5) Defendant relied upon Plaintiff's claim that it would only seek a judgment of all of the issues in its complaint in state court and then seek enforcement of the judgment in Bankruptcy; (6) As a result of relying on Plaintiff's claim that is would only seek a judgment of all issues in its complaint in state court, Defendant did not appeal any of the State Court orders nor did Defendant appeal the Bankruptcy Court's Order partially granting the motion for relief from stay. .  Finally, Defendant avers that Plaintiff's inconsistent positions would allow Plaintiff to enjoy an unfair advantage over the Defendant if not estopped.

Based on the foregoing, Defendant requests that this Court grant his dispositive motions filed in Bankruptcy Court on May 18, 2020 (Doc. 46).

**WHERFORE**,  based on the foregoing reasons, Defendant requests that this Court grant  the relief sought in his dispositive motions filed in Bankruptcy Court on May 18, 2020 (Doc. 46).

This is the 29th day of May, 2020.

THE DEFENDANT, VINROY W. REID

BY: /s/: Verna Bash-Flowers

HIS ATTORNEY
Verna Bash-Flowers
N.C. State Bar No: 38937
P.O. Box 927
Lowell, NC 28098
704-691-7220 (Phone)
877-261-2710 (Fax)
vnclaw.bashflowers@outlook.com

## DEFENDANT'S LIST OF ATTACHED EXHIBITS

**EXHIBIT A:** CONTRACT

**EXHIBIT B:** MOTION FOR COSTS

**EXHIBIT C:** BANKRUPTCY CONSENT ORDER

**EXHIBIT D:**  STATE COURT AMENDED COMPLAINT FILED BY Y2 YOGA

**EXHIBIT E:** STATE COURT FINAL ORDER (JUDGE HOOVER)

**EXHIBIT F:** MOTION FOR RELIEF FROM STAY FILED BY Y2YOGA

**EXHIBIT G:** BANKRUPTCY COURT ORDER ON MOTION FOR RELIEF FROM STAY

Exhibit A



**Y2 Yoga Expansion Construction Agreement**
**August 5th, 2013**

Page 1 of 9

Y-2 Yoga 000260

This Construction Agreement is entered into on August 5th and between Y2 Yoga ("Buyer") and VR King ("General Contractor");

In which the General Contractor is in the business of providing planning, oversight, subcontractor management, and delivery of Permitting, Construction, and Build Out of the Y2 Expansion located in Cotswold;

And whereas Buyer and General Contractor shall collectively be referred to as the Parties.

In line with the above stated, the Parties agree to the following key terms:

## 1.   SERVICES

(a)    Services.  In adherence with the schedule and pricing set forth in Section 4, Service Provider shall provide Construction and related services outlined in Annex A and B, in harmony with the rest of the terms in this agreement.

(b)    Scope Changes.  In the rare occasion that a scope change is needed in relation to this agreement, both Parties will have the obligation to work through such event while the project is in progress.  Although some changes may slightly modify the scope, not all will change the pricing agreement in Section 4.   If any request or collection of requests are materially different than the original scope of services outlined in Annex A, both parties agree to mutually review changes and discuss next steps in a reasonable and timely manner.

(c)    Transferability of project.    In the event the General Contractor cannot complete Construction for reasons material or immaterial, General Contractor agrees to transfer all pertinent documents, files, plans, etc. to Buyer free of delay, liens, or claim of rights.  If the need for transfer occurs, Buyer shall ensure appropriate payment is posted or scheduled to be posted as set forth in this agreement.   Under no circumstances otherwise, shall the General Contractor delay the progression of the Construction phase or impose non-pre-identified cost due to its lack of competitiveness for the Construction phase, its breach of this agreement, or Buyer's sole discretion to move in another direction.

## 2.   CONFIDENTIALITY

(a)    Confidential Information.   As used herein, "Confidential Information" means any information shared/created or directly/indirectly disclosed that is not generally known to the public or Buyer's competition. This would consider all information which shall be reasonably understood by General Contractor and its staff and subcontractors to be proprietary or confidential, whether disclosed in oral, written, visual, and electronic or any other form in which the General Contractor observes or learns in connection with this Agreement. Confidential Information includes, but is not limited to:  (a) business plans, strategies, forecasts, projects and analysis; (b) financial information and fee structures; (c) business processes, software, methods, and models; (d) employee, supplier, and client information; (e) materials and technology; (f) product and service specifications; and (g) the terms and conditions of any related or supplemental agreements.  The General Contractor shall take all reasonable steps to protect and shall not disclose Buyer's Confidential Information.  At the end of the Project, the General Contractor shall return all confidential property to the Buyer.

Y-2 Yoga 000261

3.    REPRESENTATIONS AND WARRANTIES

(a)    <u>General Contractor Representations and Warranties.</u>  The parties hereto confirm that they each have full power, authority, insurance, and licensing to enter into and fully perform the terms contained in this Agreement.

(b)    <u>Indemnities.</u>  The parties hereto agree to indemnify and hold harmless the non-breaching party against any claims, damages or penalties (including court costs and outside legal fees reasonably incurred) arising out of the breaching party's breach or alleged breach of any agreement, representation and warranty in this agreement.  Notwithstanding anything to the contrary contained herein, the foregoing indemnity shall apply to those third party claims arising from General Contractor's oversight or negligence pertaining to operational, legal, and/or financial matters.

(c)    <u>Performance of Services.</u>  The General Contractor commits that they will perform the services in a timely and professional manner, using techniques and approaches that are applicable to Buyer's needs and in line with expectations in Annex A and B.  It is known that time is of the essence and General Contractor shall stand behind timeline set forth and tied to this agreement or else make commercially reasonable efforts to make Buyer whole in the event of failure.

(d)    <u>Resources.</u>  General Contractor commits that they have, or will have at the relevant time, the resources, capacity, expertise, and know-how to provide the Services.   In the event of bringing on 3rd Parties, the General Contractor commits to fully vet 3rd Parties prior to engaging in business activity to prevent from damaging or impacting the timeline or General Contractor's potential cost of rework.

4.    PRICING, SCHEDULE, AND RELATED

(a)    <u>Pricing.</u>

- $1,304,464.50 For Completed Planning, Construction, Inspection and Occupancy Readiness
  - Note: $40,000 has been prepaid

(b)    <u>Schedule.</u>

- 11/28/13 is completion scheduled total job prep, planning, construction, subcontractor activity, and inspections.

(d)    <u>Access to Facilities and Restrictions.</u>

- One(1) 40 yard cubic dumpster at agreed upon location
- One(1) portable toilet
- No signs advertising General Contractor's business on exterior of workspace and property common grounds

Y-2 Yoga 000262

(e)  Payment Schedule and Retainers
- Deposit of $150,000.00
- End of 1st 30 Day Period: $257,275.90
- End of 2nd 30 Day Period: $552,595.50
- End of 3rd 30 Day Period: $195,402.60
- Procession of Certificate of Occupancy: $109,190.50

*Note: Draw schedule is in line with pre-identified milestones and changes in schedule shall be accounted for accordingly.

(f)  Performance Termination.  Buyer may terminate this Agreement at any time, in whole or in part, by providing written notice of termination to General Contractor, such termination to be effective as specified in the notice.  When Service Provider receives notice of termination, it will discontinue performance in accordance with Buyer's instructions. In no event will Buyer be liable to Seller for any unabsorbed overhead or unrealized profits on the terminated work.  Upon termination pursuant to this Article, Buyer will have no further obligation to Seller respecting the terminated portion(s) of the work.

## 5.   INSURANCE AND BONDING CAPACITY

(a)  Insurance Limits.

- $2,000,000.00 General Liability (Annex C)
- Buyer named as Additional Insured

(c)  Bonding Capacity.
- $1,304,464.50 of General Bonding

## 6.   MISCELLANEOUS

(a)  Weaver of Liens.  To the greatest extent permitted by law, Seller waives, and will require its subcontractors and suppliers to waive, all liens and claims, and the right to file and enforce or otherwise assert any such liens and claims, against Buyer's property or facilities for Construction or associated Services.

(b)  Notices.  Any notice of schedule or cost impact shall be in writing and sent to Walter Rasby at Walter.Rasby@sms-advisors copying Tanner Bazemore at tanner@y2yoga.com.

(c)  Governing Law.  This agreement embodies the entire understanding of the Parties with respect to the demolition and related services project and shall be governed by and interpreted in accordance with the laws of the State of North Carolina.

(d)  Counterparts.  This Agreement may be executed in one (1) or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one (1) and the

Y-2 Yoga 000263

same instrument. Signature via facsimile or electronic mail as a "PDF" shall have the same force and effects as an original signature in ink.

Both parties have acknowledged acceptance of the terms and sign on behave of their respective firms.

Y2 YOGA, LLC

Signature: _____

Print: _____

Title: _____

Date: _____

VR King Construction, LLC

Signature: _____

Print: _____

Title: _____

Date: _____

Y-2 Yoga 000264

## ANNEX A
## SCOPE OF SERVICES

The principle reason of this agreement is for the Construction and Associated services to be rendered by the Service Provider for the Buyer.

It is expected that all associated activity will be integrated and actively lead by the Service Provider. Service Provider shall bare the oversight responsibility of aligning itself, designated subcontractors, and third parties on milestones, schedules, execution, tracking/reporting, and financial adherence.

General Contractor Client Executive assigned at this agreement is __VinRoy Reid_____

Construction Project Manager assigned to this agreement is __Hakeem Bailey_____

The following areas have been identified as critical areas of focus for the General Contractor:

A. Pre-Construction and Commencement
- Operational
  - Site prep
  - Scaffolding and necessary signage set-up
  - Sub-contractor readiness

- Administrative
  - Construction Contract execution
  - Permits
  - Insurance and Bonding

- Commercial
  - Beginning Draw Invoicing and Draw Schedule

B. During Construction
- Operational
  - Construction Plan
  - Master Work Schedule Updates
  - Sub-contractor coordination and performance measuring

- Administrative
  - Sub-contractor scheduling and liability

- Commercial
  - Sub-contractor payment schedule update

C. Post Construction:
- Operational
  - Certificate of Occupancy

- Administrative
  - Final Invoicing and Subcontractor payment scheduling

- Commercial
  - Remaining Draw Satisfaction Checklist

Y-2 Yoga 000265

## ANNEX B
## GENERAL CONSTRUCTION PLAN



| ID | | Task Name | Duration | Start | Finish | Predecessors | Resource Names |
|----|---|-----------|----------|-------|--------|--------------|----------------|
| 1 | | Master Schedule Timeline | 80 days | Thu 8/4/13 | Wed 9/27/13 | | VR King Management |
| 2 | | Completion of existing agreements | 11 days | Wed 2/27/13 | Wed 3/15/13 | | VR King Dome Team |
| 3 | | Executed Installation Contract | 3 days | Mon 6/5/13 | Wed 6/7/13 | | Y2 Yoga Management |
| 4 | | Steel Contract Executed | 1 day | Thu 6/6/13 | Thu 6/6/13 | | Davidson Steel |
| 5 | | Steel Submittals | 17 days | Fri 8/9/13 | Mon 9/2/13 | | |
| 6 | | Steel Material Lead time | 10 days | Tue 9/3/13 | Mon 9/16/13 | | |
| 7 | | Steel Installation | 15 days | Tue 9/17/13 | Mon 10/7/13 | | |
| 8 | | HVAC Contract Executed | 1 day | Thu 8/6/13 | Thu 8/6/13 | | Commercial Controls Inc |
| 9 | | HVAC Submittals | 8 days | Fri 8/9/13 | Tue 8/13/13 | | |
| 10 | | HVAC Equipment Lead time | 30 days | Fri 8/16/13 | Thu 8/26/13 | | |
| 11 | | HVAC Installation | 30 days | Fri 8/16/13 | Thu 9/26/13 | | |
| 12 | | HVAC Finish | 3 days | Thu 11/14/13 | Mon 11/18/13 | 49,44 | |
| 13 | | Roofing Contract Executed | 1 day | Thu 6/6/13 | Thu 6/6/13 | | |
| 14 | | Roofing Modifications | 12 days | Fri 8/16/13 | Thu 8/29/13 | 16 | |
| 15 | | Plumbing Contract Executed | 1 day | Thu 6/6/13 | Thu 6/6/13 | | Plumbing Masters |
| 16 | | Plumbing Submittals | 3 days | Fri 8/9/13 | Thu 8/15/13 | 18 | |
| 17 | | Plumbing Materials Lead time | 15 days | Fri 8/16/13 | Thu 8/6/13 | 16 | |
| 18 | | Plumbing Installation | 20 days | Fri 8/9/13 | Thu 10/3/13 | | |
| 19 | | Plumbing Finish | 3 days | Thu 11/14/13 | Mon 11/18/13 | 44,45 | |
| 20 | | Elevator Contract Executed | 1 day | Thu 8/6/13 | Thu 8/6/13 | | Otis Elevator |
| 21 | | Elevator Submittals | 10 days | Fri 8/9/13 | Thu 8/22/13 | 20 | |
| 22 | | Elevator Material Lead time | 25 days | Fri 8/23/13 | Thu 9/26/13 | 21 | |
| 23 | | Elevator Installation | 13 days | Tue 10/8/13 | Mon 10/21/13 | 22,7 | |
| 24 | | Fire Protection Contract Executed | 1 day | Thu 6/6/13 | Thu 6/6/13 | | Fire Protection Inc |
| 25 | | Fire Protection Submittals | 3 days | Tue 8/6/13 | Thu 8/8/13 | 24 | |
| 26 | | Fire Protection Material Lead time | 13 days | Tue 8/13/13 | Mon 8/23/13 | 25 | |
| 27 | | Fire Protection Installation | 10 days | Tue 10/15/13 | Mon 10/28/13 | 26,39 | |
| 28 | | Electrical Contract Executed | 1 day | Thu 6/6/13 | Thu 6/6/13 | | Triangle Electric |
| 29 | | Electric Submittals | 5 days | Fri 8/9/13 | Thu 8/15/13 | 28 | |
| 30 | | Electrical Material Lead time | 15 days | Fri 8/16/13 | Thu 9/5/13 | 29 | |
| 31 | | Electrical Installation | 20 days | Fri 8/9/13 | Thu 10/3/13 | 30 | |
| 32 | | Electrical Finish | 2 days | Tue 11/19/13 | Wed 11/20/13 | 44,45 | |
| 33 | | VR King Mobilization | 3 days | Thu 8/8/13 | Mon 8/12/13 | | VR King Install Team |
| 34 | | Concrete Installation | 5 days | Tue 8/13/13 | Mon 8/19/13 | 33 | VR King Install Team |
| 35 | | Carpentry Installation | 5 days | Fri 8/16/13 | Mon 8/19/13 | 33 | VR King Install Team |
| 36 | | Masonry Installation | 10 days | Tue 8/13/13 | Mon 8/26/13 | 33 | VR King Install Team |
| 37 | | Fire Proofing Contract Executed | 1 day | Tue 8/5/13 | Tue 8/5/13 | | Marco Company |
| 38 | | Fire Proofing Installation | 3 days | Mon 10/14/13 | Mon 10/16/13 | 7,7 | |
| 39 | | Stairs and Railings Installation | 10 days | Tue 10/15/13 | Mon 10/28/13 | 38,39 | VR King Install Team |

Project Y2 Yoga Master Schedule.mpp
Date: Wed 6.7.13

| Task | | Milestone | ♦ | External Tasks | |
|------|--|-----------|---|----------------|--|
| Split | | Summary | | External Milestone | |
| Progress | | Project Summary | | Deadline | |

Page 1

Y-2 Yoga 000266

# ANNEX B
## GENERAL CONSTRUCTION PLAN (cont)

| ID | | Task Name | Duration | Start | Finish | Predecessors | Resource Names |
|----|---|-----------|----------|-------|--------|--------------|----------------|
| 40 | | Inspections - Steel | 1 day | Tue 10/8/13 | Tue 10/8/13 | 37 | City Inspectors |
| 41 | | Inspections - Fire Proofing | 1 day | Tue 10/15/13 | Tue 10/15/13 | 39 | City Inspectors |
| 42 | | Inspections - Concrete | 1 day | Tue 8/20/13 | Tue 8/20/13 | 34 | City Inspectors |
| 43 | ✓ | Inspections - Masonry | 1 day | Tue 8/27/13 | Tue 8/27/13 | 35 | City Inspectors |
| 44 | | Walls Installation - Rough | 12 days | Tue 10/29/13 | Wed 11/13/13 | 40,38 | VR King Install Team |
| 45 | | Ceiling Installation - Rough | 12 days | Tue 10/29/13 | Wed 11/13/13 | | VR King Install Team |
| 46 | | Inspections - Electrical | 1 day | Tue 10/22/13 | Tue 10/22/13 | 23 | City Inspectors |
| 47 | | Inspections - Plumbing | 1 day | Fri 10/4/13 | Fri 10/4/13 | 18 | City Inspectors |
| 48 | | Inspections - Fire Protection | 1 day | Wed 8/4/13 | Wed 8/4/13 | 37 | City Inspectors |
| 49 | | Flooring Installation - Rough | 26 days | Wed 10/9/13 | Tue 11/13/13 | 33,40 | VR King Install Team |
| 50 | | Millwork Fabrication | 20 days | Thu 6/6/13 | Wed 8/18/13 | 2 | |
| 51 | | Millwork Installation | 3 days | Thu 11/21/13 | Fri 11/22/13 | 56,51 | |
| 52 | 🔲 | Furniture Contract Executed | 1 day | Mon 6/27/13 | Mon 6/27/13 | | Premier Products |
| 53 | | Furniture Materials Lead Time | 15 days | Tue 6/25/13 | Mon 6/17/13 | 52 | |
| 54 | | Install Partition | 3 days | Thu 11/14/13 | Mon 11/18/13 | 49,44 | |
| 55 | 🔲 | Store Fixed Metals Contract Executed | 1 day | Tue 10/29/13 | Tue 10/29/13 | 39,7 | TBD |
| 56 | | Install Standard glass and door | 5 days | Wed 10/20/13 | Tue 11/6/13 | 54 | |
| 57 | | Flooring Finish | 4 days | Wed 11/13/13 | Mon 11/18/13 | 49 | |
| 58 | | Walls Finish | 8 days | Thu 11/14/13 | Wed 11/20/13 | 44,49 | |
| 59 | | Ceiling Finish | 5 days | Tue 11/19/13 | Mon 11/25/13 | 45,13 | |
| 60 | | Walk Thru Inspections | 1 day | Mon 11/25/13 | Mon 11/25/13 | | Owner Designers |
| 61 | | Punched Items | 1 day | Tue 11/26/13 | Tue 11/26/13 | 60 | |
| 62 | | Final Inspection | 1 day | Wed 11/27/13 | Wed 11/27/13 | | ALL |
| 63 | | Certificate of Occupancy | 1 day | Thu 11/28/13 | Thu 11/28/13 | 62 | City Inspectors |

| | | | | | | |
|---|---|---|---|---|---|---|
| Project Y2 Yoga Master Schedule_v4 | Task | | Milestone | ◆ | External Tasks | |
| Date Wed 8/7/13 | Split | | Summary | | External Milestone | |
| | Progress | | Project Summary | | Deadline | |

Page 2

Page 8 of 9

Y-2 Yoga 000267

## ANNEX C
## CERTIFICATE OF GENERAL LIABILITY INSURANCE

To be submitted for buyer files within 5 days of signature

Y-2 Yoga 000268

Exhibit B

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
NO. 16-CVS-23179

Y2 YOGA COTSWOLD, LLC,

      Plaintiff,

v.

VINROY W. REID;
VR KING CONSTRUCTION LLC;
VR INVESTMENTS, LLC; BARANKO
ENTERPRISE, INC., and
SPEND MANAGEMENT
SOLUTIONS, LLC,

      Defendants.

Y2 YOGA COTSWOLD, LLC'S
MOTION FOR COSTS

Plaintiff Y2 Yoga Cotswold, LLC moves the Court, pursuant to N.C. Gen. Stat.

§§ 6-1, 6-20, 7A-305, and 7A-314, for an Order taxing the costs of this action to

Defendants Vinroy W. Reid, VR King Construction LLC, VR Investments, LLC and

Baranko Enterprise, Inc. (together, the "Reid Defendants"). In support of the Motion,

Y2 Yoga states as follows:

A jury trial was held on this matter at the term beginning September 18, 2018.

The jury returned a verdict in favor of Plaintiff Y2 Yoga and awarded damages

totaling approximately $400,000. Y2 Yoga, therefore, seeks recovery of the following

reasonable and necessary costs incurred in this matter:

| Description | N.C. Gen. Stat. § | Amount |
|---|---|---|
| **Advance costs** | | |
| Facilities fee | § 7A-305(a)(1) | $16.00 |
| Initial filing and LAA fees | § 7A-305(a)(2) | $180.00 |
| Certified mail service | § 7A-305(d)(4) | $87.10 |
| Process fees | § 7A-305(d)(6) | $120.00 |

| Other sheriff's fees | § 7A-305(d)(6) | $165.00 |
|---|---|---|
| Hearing fees | § 7A-305(f) | $40.00 |
| | | |
| Mediation costs | § 7A-305(d)(7) | $262.50 |
| | | |
| Deposition costs[1] | § 7A-305(d)(10) | $14,027.80 |
| | | |
| Trial exhibits | § 6-20 and 7A-305[2] | $2,368.22 |
| | | |
| **Expert witnesses** | | |
| L. Steven Moore, P.E., RRC, REWC | | |
| • Testimony time and related compensation and allowances | § 7A-305(d)(11) and 7A-314 | $3,491.86 |
| • Additional trial expert fees | § 7A-314(d)[3] | $13,485.74 |
| Nicholas R. Harris, CPA, CFA, CFE | | |
| • Testimony time and related compensation and allowances | § 7A-305(d)(11) and 7A-314 | $2,373.50 |
| • Additional trial expert fees | § 7A-314(d)[4] | $18,627.40 |
| | | |
| **Total costs** | | **$55,244.12** |

All of the costs incurred by Y2 Yoga and described above were reasonable and necessary in litigating this matter through trial and are recoverable under North Carolina law, as a matter of course or in the Court's discretion.

[1] Discovery included ten depositions with associated costs as follows: (1) Tanner Bazemore: $1,117.25; (2) Tim Johnston: $943.25; (3) Hakeem Bailey: $1,231.75; (4) Bruce Downing: $811.00; (5) L. Steve Moore: $656.45; (6) Thais P. Moran: $1,221.10; (7) Walter H. Rasby, III: $1,766.70; (8) G. Sean Williams: $2,979; (9) Vinroy W. Reid: $2,235.60; and (10) Amor Camatcho: $1,065.70.
[2] See also Coffman v. Roberson, 571 S.E.2d 255, 261-26 (N.C. Ct. App. 2002) (affirming award of trial exhibit costs).
[3] See also Justus v. Rosner, 802 S.E.2d 142, 155-56 (N.C. Ct. App. 2017) (affirming the trial court's award of all of plaintiff's costs associated with trial experts).
[4] See id.

2

Respectfully submitted, this 28th day of November, 2018.

RABON LAW FIRM, PLLC

David G. Guidry
N.C. State Bar No. 38675
225 E. Worthington Ave., Suite 100
Charlotte, NC  28203
704.247.3248
dguidry@usfraudattorneys.com
*Counsel for Plaintiff Y2 Yoga Cotswold, LLC*

3

## CERTIFICATE OF SERVICE

I certify that as of the date below a copy of Y2 Yoga Cotswold, LLC's Motion for Costs was served on the following counsel for the parties via fax:

John Barringer
Christopher Campbell
MCANGUS, GOUDELOCK & COURIE
6302 Fairview Road, Suite 700
Charlotte, NC 28210-2267
*Counsel for Defendants Vinroy W. Reid,
VR King Construction LLC, VR
Investments, LLC, and Baranko
Enterprise, Inc.*

Gillian S. Crowl
SWIFT, CURRIE, MCGHEE &
HIERS, LLP
1355 Peachtree St. N.E., Suite 300
Atlanta, Georgia, 30309
*Counsel for Defendant Spend
Management Solutions, LLC*

November 28, 2018.

David G. Guidry

4

Exhibit C

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

|  |  |  |
|---|---|---|
| VR KING CONSTRUCTION, LLC | ) | **Chapter 11** |
|  | ) | **Case No. 18-31635** |
|  | ) |  |
|  | ) |  |
| Debtor. | ) |  |
| _____ | ) |  |

## STIPULATION CONDITIONALLY GRANTING RELIEF FROM STAY

**NOW COMES** the above-captioned debtor, VR KING CONSTRUCTION, LLC ("KING") and Y2 YOGA COTSWOLD, LLC ("Y2"); by and through the undersigned counsel, and in consideration of this Stipulation, hereby state as follows:

1. King filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code in this Court on October 31, 2018 (the "Petition Date"). King continues in possession of its properties and the management of its business as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code

2. On October 2, 2018, in the case entitled *In re Vinroy Reid*, W.D.N.C. Case No. 18-31436 (the "Ch. 13 Case"), the following matters came before the Court: i)  the Emergency Motion for Relief from Automatic Stay for Order Allowing Creditor Y2 Yoga Cotswold, LLC to Proceed with State Court Litigation and Motion for Mandatory or Permissive Abstention ("Motion for Relief")  [Doc. 6 (filing date September 27, 2018)]; ii) the Debtor's Motion to Extend Automatic Stay ("Motion to Extend") [Doc. 7 (filing date September 27, 2018)]; iii) the Motion of Spend Management Solutions, LLC (for Preliminary Injunction [Doc. 9 (filing date September 27, 2018)] ("SMS Motion"); iv) the Supplemental Emergency Motion for Relief from Automatic Stay for Order Allowing Creditor Y2 Yoga Cotswold, LLC to Proceed with State

Court Litigation; Motion for Mandatory or Permissive Abstention, Response to Debtor's Motion to Extend Automatic Stay to Non-Debtor Entities Owned 100% by Debtor, Motion to Show Cause as to Debtor's Eligibility for Chapter 13 Relief, Motion to Dismiss or Strike Petition ("Supplemental Motion") [Doc. 17 (filing date September 28, 2018)]; and v) the Debtor's Response and Request for Hearing [Doc. 22 (filing date October 1, 2018)] (collectively the "Motions").

      3.     All of the Motions were heard pursuant to orders allowing the time periods for the notices of hearing to be shortened.

      4.     Based on the pleadings and the arguments of counsel for Y2, the Debtor and Spend Management Solutions, LLC ("SMS") in the CH. 13 Case, the Court made the following findings of fact:

      a.   As of the time the Motions were filed and as of the date of the hearings, a jury trial was being conducted in Mecklenburg County by Superior Court Judge Donnie Hoover concerning a complaint filed by Y2 in 2016. The defendants in the pending state court litigation include the Debtor, VR Investments, LLC, VR King Construction, LLC and Baranko Enterprise, Inc. (collectively, the "Corporate Debtors"), and one corporate entity which is not related to the Debtor. The factual basis for Y2's state court complaint, involving a construction project, is described in more detail in Y2's Second Amended Verified Complaint (the "Complaint") attached to the Motion for Relief as Exhibit A.

      b.   Y2's claims for relief in the state court litigation include (but are not limited to) non-core breach of contract, fraud, fraudulent transfers, alter ego, piercing the corporate veil, conversion, unfair and deceptive trade practices and breach of fiduciary duty.

      c.   All parties have extensively prepared for the state court trial. The Debtor filed his bankruptcy petition on Friday, September 21, 2018, after all jurors (except two alternates) had been selected. Judge Hoover allowed the trial to proceed with the Debtor acting only in the capacity of a fact witness, pending a ruling by this Court on the Motion for Relief. Judge Hoover stated that the trial would go forward, but that due to the automatic stay in bankruptcy, the Plaintiff should not proceed to judgment against Mr. Reid as long as he was protected by the automatic stay. As of the hearing date, the state court jury had heard five days of witness testimony.

      d.   Y2 sought in its Motion an Emergency Order allowing Superior Court Judge Hoover to proceed with the jury trial as to all parties, including the Debtor, and to enter final judgment as to all parties with respect to all issues in the Complaint.

e. After the hearing on the Motions, Y2 indicated that it would withdraw the Supplemental Motion.

5. Based on the forgoing findings of fact, the Court made the following Conclusions of Law:

a. Pursuant to 28 U.S.C. §§ 157 and 1334, this Court has jurisdiction over this matter, which is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G).

b. The stay operates to protect a debtor from his creditors, and all post-petition actions taken against a debtor are violations of the stay. *Grady v. A.H. Robins Co.*, Inc., 839 F.2d 198, 200 (4th Cir. 1988). Although the stay is an important protection for a debtor, its application in a particular case is not beyond the discretion and authority of the court. Section 362(d)(1) provides that the bankruptcy court shall grant relief from the stay for "cause." 11 U.S.C. § 362(d)(1). The Bankruptcy Code does not define cause; instead, it is determined by the court on a case-by-case basis. *Claughton v. Mixson*, 33 F.3d 4, 5 (4th Cir. 1994); *Ivester v. Miller*, 398 B.R. 408, 425 (M.D.N.C. 2008).

c. In determining whether the relief sought in the Motion for Relief should be granted, this Court is bound by the Fourth Circuit's decision in *Robbins v. Robbins (In re Robbins)*, 964 F.2d 342 (4th Cir. 1992). The *Robbins* court articulated three factors that could be considered in determining if cause existed to annul the automatic stay. The Fourth Circuit stated in *Robbins* that "factors that courts consider in deciding whether to lift the automatic stay include": (1) whether the case involves only state law so that the expertise of the bankruptcy court is unnecessary; (2) whether modifying the stay will promote judicial economy and whether there would be greater interference with the bankruptcy case if the stay were not lifted because matters would have to be litigated in the bankruptcy court; and (3) whether the estate can be protected properly by a requirement that creditors seek enforcement of any judgment through the bankruptcy court. *Robbins*, 964 F.2d at 345.

d. As to the first factor, the Complaint clearly concerns issues of state law and the expertise of this Court is not necessary.

e. As to the second factor, modifying the stay will promote judicial economy. Continuing the stay as to the state court litigation with create substantial delay, as the trial on the Complaint as to the Debtor would essentially have to start all over again. The jury is already empaneled and hearing testimony. For these same reasons, there would be greater interference with the bankruptcy case if the stay were not lifted.

f. As to the third factor, this Court can properly protect the bankruptcy estate by requiring that the enforcement of any judgment in favor of Y2 will be solely within the jurisdiction of this Court.

g. Nothing herein shall prevent the Debtor and/or the defendant entities related to him from challenging any lien, inchoate or otherwise, asserted by the Plaintiff/Y2.

6. Based upon the foregoing, on October 31, 2018, the Court held and entered an Order (the "Partial Stay Relief Order") [Doc. No. 48] with the following language:

a.      Y2's Motion for Relief should be and hereby is granted for the purpose of allowing Y2 to determine its claims, if any, in the state court litigation, and Y2's withdrawal of the Supplemental Motion is allowed;

b.      The Debtor's Motion to Extend is denied;

c.      The SMS Motion is denied as being moot;

d.      To the extent that Y2 obtains a judgment against the Debtor or any of the other defendants, Y2 is required to seek enforcement of such judgment through this Court; and

e.      This Order is effective immediately and the 10-day stay period under Rule 4001(a)(3) is waived.

7.      For judicial efficiency, without waiving any claims, defenses, rights in the bankruptcy cases involving the Corporate Debtors, the parties hereby stipulate to the Partial Stay Relief Order entered in the Ch. 13 Case which allows the Y2 to liquidate its claim, if any, against the Debtor, the Corporate Debtors and SMS.   The liquidation of Plaintiff's claim is for the sole purpose of determining the amount, if any, of the Plaintiff's claim. The bankruptcy court retains jurisdiction to determine the allowance of claims against the estate. Accordingly, Plaintiff must seek enforcement by the bankruptcy court of any rulings entered in state court.      .

*[SIGNATURES ON FOLLOWING PAGE]*

**STIPULATED AND CONSENTED TO BY:**

**THE HENDERSON LAW FIRM, PLLC**      **SODOMA LAW, P.C.**

*/s/ James H. Henderson*
James Henderson
1120 Greenwood Cliff
Charlotte, NC 28204
Telephone: (704)-333-3444
*Counsel for Y2 Yoga*

        */s/ John C. Woodman*
John C. Woodman
211 East Blvd.
Charlotte, NC 28203
Telephone: (704)442-0000
*Counsel for the Corporate Debtors*

**R. KEITH JOHNSON , P.A.**

  */s/ R. Keith Johnson*
R. Keith Johnson
1275 S. Hwy 16 Business
Charlotte, NC 28164
Telephone: (704) 827-4200
*Counsel for the Individual Debtor*

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

Y-2 YOGA COTSWOLD, LLC,

Plaintiff,

vs.

VINROY W. REID, individually, VR
KING CONSTRUCTION, LLC, and VR
INVESTMENTS, LLC,

Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
14 CVS 23138

Exhibit D

AMENDED COMPLAINT

COMES NOW Plaintiff, by and through undersigned counsel, pursuant to Rule 15 of the

North Carolina Rules of Civil Procedure, and amends the complaint and avers as follows:

### PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff, Y-2 Yoga Cotswold, LLC ("Y-2 Yoga"), is a North Carolina limited

liability company organized and existing under the laws of the State of North Carolina with its

principal place of business in Mecklenburg County, North Carolina.

2.      Defendant Vinroy Washington Reid ("Reid") is a resident of North Carolina

residing in Charlotte, Mecklenburg County, North Carolina.

3.      Defendant, VR King Construction, LLC ("King"), is a limited liability company

organized and existing under the laws of the State of North Carolina with its principal place of

business in Mecklenburg County, North Carolina. Upon information and belief, King is duly

licensed by the North Carolina Licensing Board for General Contractors to perform general

contracting work in North Carolina and holds license number 60597. Reid serves as registered

agent and managing member of King.

4. Defendant, VR Investments, LLC ("VR Investments") is a limited liability company organized and existing under the laws of the State of North Carolina. Reid serves as registered agent and managing member of VR Investments.

5. This court has jurisdiction over this dispute and venue is proper in Mecklenburg County, North Carolina.

6. All conditions precedent to the bringing of this action have been performed, have occurred or have been waived.

7. This action is brought within the applicable statute of repose.

## GENERAL ALLEGATIONS

8. Y-2 Yoga offers yoga classes and other health and well-being services to Y-2 Yoga's members and to the general public.

9. Y-2 Yoga leases retail space in the Cotswold Shopping Center, located at 280 S. Sharon Amity Road, Charlotte, Mecklenburg County, North Carolina 28211.

10. Y-2 Yoga retained Spend Management Solutions, LLC ("SMS") to provide business consulting services to Y-2 Yoga, including consulting services concerning Y-2 Yoga's expansion plans.

11. Y-2 Yoga acquired a leasehold interest in larger rental space adjoining Y-2 Yoga's existing location for the purpose of improving the space to include additional class rooms, a food bar, locker rooms, a spa, and other amenities (the "Project").

12. Y-2 Yoga, having very limited knowledge of the construction industry, contracted with SMS for assistance with the selection of a contractor and other administrative and logistical services concerning the Project.

13.    With SMS' assistance and guidance, Y-2 Yoga obtained lump sum bids from three contractors for the Project. King submitted the lowest bid.

14.    Upon information and belief, in estimating the Project costs, King failed to obtain firm bids from one or more subcontractors and failed to conduct the necessary research, analysis, and due diligence necessary to properly estimate Project costs.

15.    Y-2 Yoga, as owner, entered into a lump sum construction contract (the "Contract") with King, as general contractor, whereby King promised to construct the Project in exchange for payment of $1,388,464.10. The stated Contract amount of $1,304,464.50 reflected credits due to Y-2 Yoga for up-front payments and amounts previously paid to King for demolition work.

16.    King and Y-2 Yoga incorporated into the Contact an agreed upon schedule of values which allocated the scope of work for the Project into its constituent tasks, and assigned each task a scheduled value which added up to the Contract sum of $1,388,464.10.

17.    King started work on the Project in or about August 2013.

18.    King submitted to Y-2 Yoga eight periodic payment applications on or about the following dates: September 5, 2013, September 27, 2013, October 28, 2013, November 25, 2013, January 16, 2014, February 25, 2014, March 19, 2014, and May 15, 2014.

19.    King submitted seven requests for change orders to Y-2 Yoga.

20.    Y-2 Yoga furnished SMS with copies of King's payment applications and requests for change order when received. SMS, in turn, reviewed the payment applications and requests for change order and advised Y-2 Yoga on how to proceed.

3

21.     In early 2014, Y-2 Yoga grew concerned about construction delays, the accuracy of King's payment applications and requests for change order, the ability of King to construct the Project, and the lack of adequate supervision of the work.

22.     Y-2 Yoga requested documentation from King to substantiate King's payment applications and requests for change order. King failed to provide the requested documentation and ultimately stopped performing work on the Project.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract Against King)

23.     Plaintiff incorporates and alleges paragraphs 1 through 22 as though fully set forth herein.

24.     King materially breached the contract by, among other things, failing to furnish labor, materials, and equipment to the Project pursuant to the requirements of the Contract, failing to complete the Project in the required time, failing to provide supervision of the Project, failing to submit accurate payment applications, failing to pay subcontractors and suppliers, failing to coordinate subcontractors and suppliers, failing to comply with the building code, and ultimately abandoning the Project.

25.     As a result of King's material breaches of the Contract, Y-2 Yoga has suffered compensatory damages in excess of $1 million, including amounts paid by Y-2 Yoga to complete the Project and to repair or replace King's defective work.

26.     As a result of King's material breaches of the Contract, and King's failure to complete the Project in the time required, Y-2 Yoga has suffered loss of profits for the time the Project should have been completed but was not.

27.     Y-2 Yoga demands interest, costs, and attorneys' fees in accordance with the provisions of the Contract and applicable law.

4

## SECOND CLAIM FOR RELIEF
### (Common Law Fraud Against Reid and King)

28.　　Y-2 Yoga incorporates and alleges paragraphs 1 through 22 as though fully set forth herein.

29.　　Reid and King knew that the actual cost required to construct the Project would be higher than the Contract sum.

30.　　Reid and King knew that funds required to pay subcontractors and suppliers would run out and the Project would fail unless King obtained from Y-2 Yoga funds greater than the Contract sum.

31.　　Reid and King, being previously acquainted with SMS personnel, knew that SMS was not qualified to administer a construction project of this type.

32.　　Reid and King knew that SMS lacked the skill and experience required to properly and competently advise Y-2 Yoga on payment applications, contract administration, workmanship, scheduling, materials selection, and other aspects of a commercial construction project.

33.　　Reid and King knew that Y-2 Yoga's representative taught yoga and fitness classes for Y-2 Yoga and lacked experience in commercial construction projects.

34.　　Reid and King knowingly submitted inaccurate payment applications and unjustified requests for change order to Y-2 Yoga as a means to procure from Y-2 Yoga funds greater than the Contract sum.

35.　　Reid and King intentionally billed Y-2 Yoga twice for the same work by changing the description. For example, Reid and King billed Y-2 Yoga for "soil exploration" in the first payment application and later as a change order for "move plumbing for footings." Similarly, Reid and King billed Y-2 Yoga for "refill and compact, with stone" in the first payment

5

application and later in the fourth payment application as a change order for "refill footing with washed stone, dowel into existing footing, reroute or cut pipe."

36.    Reid and King intentionally misrepresented the value and completion percentage of work and materials "completed and stored to date" in every payment application submitted to Y-2 Yoga.

37.    To conceal the inaccuracies of the payment applications, Reid and King employed sleight of hand maneuvers such as installing over areas before rough in work or wiring had been installed between the wall studs.

38.    Reid and King intentionally omitted or decreased the value of work from previously submitted payment applications to artificially inflate the scheduled value for certain items. For example, the scheduled value for "HVAC – Subcontract" throughout all payment applications was $240,000.00. By the fourth payment application, after employing their deceptive billing practices, Reid and King billed and were paid $585,041.20 for "HVAC – Subcontract."

39.    Using the methods described above, Reid and King fraudulently billed Y-2 Yoga for, among other scheduled items: superintendent; plan printing, building permitting, signage allowance, millwork materials, storefront materials, roof leader allowance, tool rental, demolition, concrete, masonry, carpentry materials, door material and labor, paint, restroom accessories, plumbing, electrical, fire alarm, interior walls, acoustical ceiling materials, flooring materials, shower and cold room tile, vertical platform, heating, ventilation and air conditioning, fire sprinklers, electrical, soil investigation, refilling and compaction of soil, and dumpster containers.

40.    As the Project progressed, Reid and King inserted items into the schedule of values without requesting a change order. For example, in the seventh payment application, Reid and King billed Y-2 Yoga $10,000.00 for "profit and overhead." The unilaterally inserted items exceed $45,000.00.

41.    Over the course of the Project, Reid and King submitted eight payment applications totaling $3,316,630.77.

42.    The sum of the amount requested in the eight payment applications submitted to Y-2 Yoga exceeds the original Contract sum by $1,950,725.77.

43.    The sum of the amount requested in the eight payment applications submitted to Y-2 Yoga exceeds the Contract sum, as adjusted by change orders one through six, by $1,805,550.57.

44.    The sum of the amount requested in the eight payment applications submitted to Y-2 Yoga exceeds the original Contract sum plus approved and rejected change orders by $1,682,320.57.

45.    To camouflage their manipulations of the scheduled values, and to minimize the appearance of an increase in the purported Contract sum, Reid and King deleted from the eighth payment application scheduled values for plan printing, roofing upgrades, storefront installation, operable partition, acoustical ceiling, flooring, wall painting, restroom accessories, soil exploration, and refilling and compacting with stone. Based upon these manipulations alone, and without regard to the other fraudulent acts committed by Reid and King, Y-2 Yoga suffered damages of $741,768.30.

46.    In the spring of 2014, Y-2 Yoga and SMS made repeated requests to Reid and King for documentation demonstrating that the Project funds paid to King were actually spent on

the Project. Reid and King failed and refused to provide the requested documentation. Instead, Reid and King submitted the eighth payment application to Y-2 Yoga requesting payment of an additional $611,419.74.

47. The concealments and misrepresentations of Reid and King were reasonably calculated to deceive Y-2 Yoga.

48. The concealments and misrepresentations were done with intent to deceive and with the intent that Y-2 Yoga act upon the concealments and misrepresentations.

49. Y-2 Yoga reasonably relied upon and was in fact deceived by the concealments and misrepresentations of Reid and King.

50. Y-2 Yoga suffered principal damages in excess of $25,000.00 proximately caused by Reid's and King's concealments and misrepresentations.

51. Reid and King participated in the fraud and the fraud was related to the above-stated compensatory damages.

52. Y-2 Yoga is entitled to recover punitive damages from Reid and King pursuant to section 1D-5 of the North Carolina General Statutes.

## THIRD CLAIM FOR RELIEF
### (Alternative Claim for Negligent Misrepresentation Against Reid and King)

53. Y-2 Yoga incorporates paragraphs 1 through 22 of this Complaint and those portions of paragraphs 35 through 45 describing misrepresentations in payment applications as though fully set forth herein.

54. In the alternative to the preceding claim against Reid and King for common law fraud, Y-2 Yoga asserts a claim against Reid and King for negligent misrepresentation.

55. Reid and King knew and intended for Y-2 Yoga to rely upon the representations contained in the payment applications.

8

56.    Reid and King were obligated to exercise due care with respect to representations contained in the payment applications.

57.    Reid and King failed to exercise reasonable care and competence in preparing the payment applications.

58.    Y-2 Yoga justifiably relied upon the representations of Reid and King and, in reliance on thereon, made payments for work not earned.

59.    Y-2 Yoga's justifiable reliance upon Reid's and King's misrepresentations caused Y-2 Yoga to incur financial damage.

60.    In the spring of 2014, Y-2 Yoga and SMS made repeated requests to Reid for documentation demonstrating that the Project funds paid to King were spent on the Project. Reid and King failed to provide the requested documentation.

61.    By reason of the foregoing, Y-2 Yoga had been damaged in an amount in excess of $25,000.00, plus interest, attorneys' fees, and costs.

### FOURTH CLAIM FOR RELIEF
**(Violation of N.C. Gen. Stat. § 75-1.1 *et seq.* Against Reid and King)**

62.    Y-2 Yoga incorporates paragraphs 1 through 51 of this Complaint as though fully set forth herein.

63.    Reid and King engaged in unfair or deceptive acts or practices in violation of section 75-1.1 *et seq.* of the North Carolina General Statutes with respect to Y-2 Yoga, including:

    a.    Obtaining property by false pretenses in violation of section 14-100 of the North Carolina General Statutes;

    b.    Committing common law fraud; *and*

    c.    Engaging in trickery, artifice, and deceit for pecuniary gain.

9

64.   Reid's and King's acts were in or affected commerce.

65.   As a result of Reid's and King's unfair and deceptive trade practices, Y-2 Yoga has suffered damages in the principal amount in excess of $25,000.00.

66.   Y-2 Yoga requests that damages suffered by Y-2 Yoga as a result of Reid's and King's unfair or deceptive trade practices be trebled as required by section 75-16 of the North Carolina General Statutes.

67.   Y-2 Yoga requests an award of attorneys' fees as permitted by section 75-16.1 of the North Carolina General Statutes.

### FIFTH CLAIM FOR RELIEF
#### (Piercing the Corporate Veil Against All Defendants)

68.   Y-2 Yoga incorporates paragraphs 1 through 67 of this Complaint as though fully set forth herein.

69.   Reid exercises complete domination and control over the finances, policies, and business practices of King and VR Investments (collectively the "LLC Defendants") to such a degree that the LLC Defendants operate merely as an alter ego of Reid.

70.   Reid serves as managing member of King.

71.   Reid serves as managing member of VR Investments.

72.   Dealings among the LLC Defendants are not arms-length transactions, but rather entered for the purposes of concealing assets and defrauding creditors. For example, King conveyed parcel number 081-166-94 to VR Investments without payment or other consideration.

73.   The LLC Defendants operate with no independent will, and are financially dependent on Reid.

10

74.    Based upon Y-2 Yoga's most recent assessment, Reid and King misappropriated approximately $900,000.00 to $1 million from Y-2 Yoga. Reid and King refuse to account for the Project funds paid by Y-2 Yoga.

75     Upon information and belief, and based upon Reid's representations in early 2014 that King had insufficient funds to complete the Project or pay amounts due to subcontractors or suppliers, Reid directed Project funds paid by Y-2 Yoga to King out of King and toward Reid's other businesses or personal pursuits.

76.    The aforesaid acts justify piercing the corporate veil and holding all Reid and the LLC Defendants liable for the damages suffered by Y-2 Yoga.

WHEREFORE, Y-2 Yoga prays as follows:

A.     That the Court exercise its equitable power to pierce the corporate veils such that Reid and both LLC Defendants be jointly and severally liable for all damages awarded to Y-2 Yoga, whether statutory, in contract, in tort, or any combination thereof;

B.     That judgment be entered in favor of Y-2 Yoga and against Defendants for compensatory damages in an amount to be proved at trial;

C.     That Y-2 Yoga be awarded punitive damages against Reid and the LLC Defendants pursuant to section 1D-5 of the North Carolina General Statutes on Y-2 Yoga's common law fraud claim;

D.     That Y-2 Yoga be awarded treble damages against Reid and the LLC Defendants pursuant to section 75-16 of the North Carolina General Statutes;

E.     That Y-2 Yoga be awarded attorneys' fees pursuant to section 75-16.1 of the North Carolina General Statutes;

11

F.      That Y-2 Yoga be allowed to elect its remedies upon the reading of the verdict;

G.      For an award of interest and costs;

H.      For a trial by jury on all issues so triable; *and*

I.      For such other and further relief as this Court may deem just and proper.

**DATED** this ___27th___ day of January, 2015.


                    HORACK, TALLEY, PHARR, & LOWNDES, P.A.


                    By: _____
                    Gregory E. Shelton
                    2600 One Wells Fargo Center
                    301 S. College Street
                    Charlotte, NC  28202
                    (704) 377-2500 (telephone)
                    (704) 372-2619 (facsimile)
                    gshelton@horacktalley.com

                    ATTORNEYS FOR PLAINTIFF

12

## CERTIFICATE OF SERVICE

Pursuant to Rule 5(b) of Section 1A-1 of the North Carolina General Statutes, I certify that on this date, I served a copy of the foregoing and attached Amended Complaint on the defendant Vinroy W. Reid, by depositing a copy thereof, enclosed in a pre-paid envelope, in an official depository under the exclusive care and custody of the United States Postal Service, properly addressed as follows:

> Vinroy W. Reid
> 7407 Boswell Road
> Charlotte, NC  28215
> *(Defendant)*
>
> Fenton T. Erwin, Jr., Esq.
> Erwin, Bishop, Capitano & Moss, P.A.
> 4521 Sharon Road
> Suite 350
> Charlotte, NC 28211

**DATED** this 27th day of January, 2015.

HORACK, TALLEY, PHARR & LOWNDES, P.A.

By: _____
Gregory L. Shelton
2600 One Wells Fargo Center
301 S. College Street
Charlotte, NC 28202
(704) 377-2500 (telephone)
(704) 714-7935 (facsimile)
gshelton@horacktalley.com

ATTORNEYS FOR PLAINTIFF

13

Exhibit E

STATE OF NORTH CAROLINA                    IN THE GENERAL COURT OF JUSTICE
                                           SUPERIOR COURT DIVISION
COUNTY OF MECKLENBURG                       CASE NO. 16-CVS-23179

Y2 YOGA COTSWOLD, LLC,

        Plaintiff,

v.

VINROY W. REID; VR KING                    FINAL JUDGMENT
CONSTRUCTION LLC; VR
INVESTMENTS, LLC; BARANKO
ENTERPRISE INC., and SPEND
MANAGEMENT SOLUTIONS, LLC,

        Defendants.

This case was tried by jury during the September 18, 2018 term of Superior

Court of Mecklenburg County.

On November 2, 2018, the jury returned its verdict on the issues submitted to

the jury as follows:

A.    BREACH OF CONTRACT-REID DEFENDANTS

        1.    "Did the Reid Defendants breach a construction contract with plaintiff
Y2 Yoga?"

        Yes

        2.    "What amount of damages is the plaintiff entitled to recover from the
Reid Defendants for breach of a construction contract?"

        $168,021.00

        3.    "What amount of special damages is the plaintiff entitled to recover
from the Reid Defendants for breach of a construction contract?"

        $228,628.57

## B.   FRAUD

4.   "Was the plaintiff damaged by the fraud of the Reid Defendants?"

No

5.   "What amount is the plaintiff entitled to recover from the Reid Defendants as damages for fraud?"

n/a

## C.   NEGLIGENT MISREPRESENTATION

6.   "Was the plaintiff financially damaged by a negligent misrepresentation of the Reid Defendants?"

No

7.   "What amount is the plaintiff entitled to recover from the Reid Defendants as damages for negligent misrepresentation?"

n/a

## D.   CONVERSION

8.   "Did the Reid Defendants convert the property of the plaintiff?"

No

9.   "What amount is the plaintiff entitled to recover from the Reid Defendants for the conversion of the plaintiff's project funds?"

n/a

## E.   PUNITIVE DAMAGES

10.   "Are the Reid Defendants liable to the plaintiff for punitive damages?"

No

11.   "What amount of punitive damages, if any, does the jury in its discretion award to the plaintiff against the Reid Defendants?"

n/a

## F.   UNFAIR OR DECEPTIVE TRADE PRACTICES

12.   "Did the Reid Defendants conceal receipt of, and use of, confidential bids from competing contractors?"

No

13.   "Did the Reid Defendants represent to the plaintiff a false bid for the project?"

No

14.   "Did the Reid Defendants represent to the plaintiff change orders with inaccurate and misleading information?"

No

15.   "Did the Reid Defendants conceal conflicts of interest with Spend Management Solutions?"

No

16.   "Did the Reid Defendants misappropriate project funds paid by Y2 Yoga?"

No

17.   "Did the Reid Defendants represent incorrect or incomplete project status information to the plaintiff?"

Yes

18.   "Did the Reid Defendants withhold requested project documents and records?"

No

19.   "Did the Reid Defendants fraudulently transfer real estate to conceal assets?"

No

3

20.    "Was the Reid Defendants' conduct in commerce or did it affect commerce?"

No

21.    "Was the Reid Defendants' conduct a proximate cause of the plaintiff's injury?"

n/a

22.    "In what amount has the plaintiff been injured by the Reid Defendants for unfair or deceptive trade practices which have proximately caused damage to Plaintiff?"

n/a

G.    FRAUDULENT TRANSFER

23.    "Were the Reid Defendants' transfers of 1720 Pegram Street, 1413 Catherine Simmons, 626 Char Meck, 1228 Clanton Rd., 2586 Hemphill Street, and 9809 E. W.T. Harris Blvd. fraudulent transfers?"

No

H.    BREACH OF CONTRACT-SPEND MANAGEMENT SOLUTIONS

24.    "Did the plaintiff and the defendant Spend Management Solutions enter into a contract under which Defendant Spend Management Solutions would provide construction management related services?"

No

25.    "Did Defendant Spend Management Solutions breach a contract for construction management services with the plaintiff?"

No

26.    "Was the defendant Spend Management Solutions' failure to perform a material term of the contract caused by the conduct of the plaintiff?"

Yes

4

27. "What amount is the plaintiff entitled to recover from Spend Management Solutions for breach of the contract for construction management services?"

n/a ,

Prior to the return of the jury verdict, the Reid Defendants and Spend Management Solutions filed Motions for Directed Verdict. After a hearing, the Court entered an oral Order on the Directed Verdict Motions. The written Order on the Directed Verdict Motions is being entered contemporaneously with this Final Judgment.

Following the return of the jury verdict, Y2 Yoga filed a Motion for New Trial, a Motion for Judgment Notwithstanding the Verdict on Attachment Issues, and a Motion for Costs. After a hearing, the Court entered an Order on Post-Verdict Motions. The Order on Post-Verdict Motions is being entered contemporaneously with this Final Judgment.

Based on the foregoing,

IT IS THEREFORE ORDERED, based on the verdict of the jury that judgment is entered for Defendant Spend Management Solutions on Plaintiff Y2 Yoga's claim for breach of contract.

IT IS FURTHER ORDERED, based on the verdict of the jury, that judgment is entered for the Reid Defendants on Plaintiff Y2 Yoga's claims for fraud, negligent misrepresentations, conversion, fraudulent transfer, punitive damages, and unfair or deceptive trade practices.

IT IS FURTHER ORDERED, based on the verdict of the jury, that judgment is entered for Plaintiff Y2 Yoga against the Reid Defendants for breach of contract,

5

and damages in the amount of $396,649.57, with interest at the legal rate of 8% from and after the date of breach, March 21, 2014, are awarded to Plaintiff Y2 Yoga.

IT IS FURTHER ORDERED that Plaintiff Y2 Yoga's costs of this action are taxed to the Reid Defendants based on this judgment upon separate application by Plaintiff Y2 Yoga. This judgment represents a complete and final disposition of all claims and issues in this action.

FEB 6 2019

Dated: ~~December ___, 2018.~~

The Honorable Judge Donnie Hoover
Superior Court Judge, Presiding

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

*Exhibit F*

In Re:                              )
                                    )
    VINROY W. REID                  )        Case No. 18-31436
                                    )        Chapter 13
              Debtor                )
                                    )

---

**EMERGENCY MOTION FOR RELIEF FROM AUTOMATIC STAY FOR ORDER ALLOWING CREDITOR Y2 YOGA COTSWOLD, LLC TO PROCEED WITH STATE COURT LITIGATION; MOTION FOR MANDATORY OR PERMISSIVE ABSTENTION**

Y2 Yogo Cotswold, LLC ("Movant"), pursuant to Section 362(d) of the Bankruptcy Code, 28 U.S.C. § 1334(c)(1) and (2), and Rule 4001 of the Federal Rules of Bankruptcy Procedure, moves the Court for an entry of an order terminating and providing relief from the automatic stay imposed under Section 362(a) of the Bankruptcy Code, or alternatively abstaining, to allow Movant to resume and pursue a certain state court litigation against the Debtor that was pending before the Petition Date.[1] In support of its Motion, the Movant respectfully states as follows:

## JURISDICTION

Pursuant to 28 U.S.C. §§ 157 and 1334, this Court has jurisdiction over this matter, which is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G).

## NECESSITY FOR EMERGENCY RELIEF

As of the time this pleadings is being filed with the Court, a jury trial is being conducted in Mecklenburg County by Superior Court Judge Donnie Hoover concerning a complaint filed by Movant) in 2016. The defendants in the pending state court litigation include the Debtor, three corporate entities related to the Debtor, and one corporate entity which is not related to the Debtor. The factual basis for Movant's state court complaint, involving a construction project, is described in more detail below and in Movant's Second Amended Verified Complaint (the "Complaint") attached hereto as Exhibit A.

Movant's state court claims for relief include breach of contract, fraud, fraudulent transfers, alter ego, piercing the corporate veil, conversion, unfair and deceptive trade practices and breach of

---

[1] Y2 Yoga Cotswold, LLC v. Vinroy W. Reid, VR King Construction LLC, VR Investments, LLC, Baranko Enterprise, Inc., and Spend Management Solutions, LLC, currently pending in the General Court of Justice, State of North Carolina, Mecklenburg County, Superior Court Division, File No. 16-CVS-23179.

fiduciary duty. Aware that the jury trial was scheduled to begin on Monday, September 24, 2018, the Debtor filed his bankruptcy petition on Friday, September 21, 2018. Movant seeks Emergency Orders allowing Judge Hoover to proceed with the jury trial to enter judgment as to all issues. All parties have extensively prepared for the trial. It is not in the interest of justice for this Court to delay or limit the scope of the pending trial. Nor is it in the interest of justice for this Court to condone the Debtor's strategic (and bad faith) decision to delay the state court trial, made with the hope that he will fare better before a U.S. Bankruptcy Judge than a jury of his peers.

## FACTUAL BACKGROUND

Movant is a small, closely held business formed in 2009, which operates a successful yoga studio, restaurant and spa at Cotswold Village ("Cotswold") in Charlotte, N.C. Under the management of Tanner Bazemore ("Bazemore"), Movant has become a successful and well regarded business.[2] Because of its popularity, Movant quickly outgrew its original 2,300 square foot leased space in Cotswold. When the Charley's Restaurant in Cotswold decided to close, Bazemore identified the vacant 12,000 square foot space as an opportunity to expand Movant's business. Movant engaged Spend Management Solutions, LLC ("SMS") to help with its expansion plans and construction project management. In early 2013, on the recommendation of SMS, Movant selected VR King Construction, LLC ("VR King") as the general contractor for the project. The Debtor is the registered agent and sole managing member of VR King.

The Construction Agreement between Movant and VR King provides that the project was to be completed by November 28, 2013 for a total cost of $1,388,464.50. Movant and VR King agreed that the funds provided by Movant were to be used by VR King to pay subcontractors and suppliers and for the specific work and materials for Movant's project. Over the course of the project, VR King and the Debtor repeatedly increased the costs of the project over the agreed upon amount, by issuing various "change orders". The Debtor and VR King issued change orders with inaccurate or misleading information which was intended to deceive Movant. The Debtor and VR King were not following industry standard practices, not competently performing the work on the project, not performing required work, not adequately supervising work on the project, and were performing substandard, deficient and defecting work. Project funds were mismanaged and misappropriated. The "construction management" provided by SMS was at best, grossly negligent.

By mid-January, 2014, Movant had paid VR King $1,433,915.50 and the project deadline had passed. When Movant pressed the Debtor and VR King for information about the legitimacy of change orders and the accuracy of scheduling information, the Debtor did not provide the requested information and documentation, claimed he did not have funds to complete the project, could not account for his use of funds received, refused to provide cost and scheduling information to complete the project, and refused to proceed with work unless Movant approved a bogus seventh "change order". After Movant did not approve the seventh "change order", the Debtor and VR King abandoned the

---

[2] 2016 Charlotte Five Best Yoga Studio; 2013 Creative Loafing Reader's Choice Best Yoga Studio; 2013 Charlotte Magazine Voter's Choice Best Yoga Studio; 2012 Creative Loafing Reader's Choice Best Yoga Studio; 2011 Creative Loafing Reader's Choice Best Yoga Studio; 2011 Charlotte Magazine Best Yoga Class.

project. The Debtor and VR King did not pay a number of subcontractors and suppliers.

Movant paid a replacement general contractor over $1.7 million to repair and replace the Debtor's work and to complete the project to its original required and planned specifications. These amounts were in addition to the over $1.4 million Movant had already paid VR King. The project was completed in March, 2015, 15 months after the original completion deadline. During this time, Movant had to pay Cotswold approximately $250,000.00 for rent and related charges.

The Complaint alleges that the Debtor related entities, VR Investments and Baranko Enterprises, operated as an alter ego or instrumentality of the Debtor. The Debtor caused funds provided by Movant to be transferred to himself and/or his related entities. In August and November of 2013, and in January of 2014, VR King purchased three properties with a combined tax value of $650,000.00. Upon information and belief, cash was used to purchaser the properties. In March 2014, the Debtor formed VR Investments. In April, 2014, the Debtor caused VR King to transfer the three properties to VR Investments for no consideration. Also in April, 2014, the VR Investments received three additional properties from the Debtor, having a combined tax value of approximately $285,100.00.

In April, 2014, there was a fire at one of the properties, which the Debtor contends destroyed all of the records related to Movant's project. The Charlotte Mecklenburg Police, after finding matches and gasoline inside the building, concluded that the cause of the fire was arson. All of the building's doors were locked and there was no sign of forced entry. The Debtor was one of two people with access to the building. The Debtor was on notice of the dispute with Movant at the time of the fire.

Movant's Complaint alleges that the Debtor used funds from Movant to purchase a new truck and to make lavish personal purchases. Bank account statements show that the Debtor regularly diverted funds received by VR King to himself, VR Investments, Baranko Enterprise and other entities that the Debtor owns or controls, Youth Hope International, LLC and Mamas Caribbean Grill, Inc. Records show the Debtor commingles funds and assets of the businesses. For example, the Debtor buys restaurant food and supplies for his Mama's restaurant out of the account for VR King, and he buys construction materials and supplies out of his Mama's restaurant accounts. Movant's funds were used to improve or renovate real property owned by Baranko Enterprise. The Debtor transferred funds received from Movant to Youth Hope International, LLC, which is not a legitimate non-profit corporation. Records further show that the Debtor has tried to conceal his diversion of Movant's funds by, amount other things, using a false social security number to open bank accounts, and by closing bank accounts and transferring funds to newly opened bank accounts.

## LEGAL ARGUMENT

### A.    *Relief from the Automatic Stay.*

Section 362(d)(1) of the Bankruptcy Code provides in relevant part: "On request of a third party in interest, and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay – (1) for cause[.]" 11 U.S.C. § 362(d)(1). In these situations, Courts seems to treat relief from stay abstention interchangeably. Courts have granted relief from the stay for cause under this provision when

Page 3 of 9

necessary to permit pending litigation to be concluded in another forum if the non-bankruptcy suit involves multiple parties or is ready for trial. *See, e.g., In re Tucson Estates, Inc.*, 912 F.2d 1162, 1166 (9th Cir. 1990) (stating that "[w]here a bankruptcy court may abstain from deciding issues in favor of an imminent state court trial involving the same issues, cause may exist for lifting the stay as to the state court trial"); *In re Kemble*, 776 F.2d 802, 807 (9th Cir. 1985) (affirming an order lifting the stay to permit a creditor to pursue a conversion and fraudulent conveyance action pending in the federal district court following a remand of the case by the appellate court for a retrial on the damages issue).

To obtain relief from the automatic stay, the movant must first establish a prima facie case that "cause" exists for the relief under Section 362(d)(1). *See In re Duvar Apt., Inc.*, 205 B.R. 196, 200 (9th Cir. BAP 1996). Once a prima facie case has been established, the burden shifts to the debtor to show that relief from the stay is unwarranted. *See* 11 U.S.C. § 362(g)(2); *In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1285 (2d Cir. 1990).

In *Tucson Estates*, the Ninth Circuit held that the bankruptcy court had abused its discretion by not abstaining and entirely lifting the stay to enable litigation to proceed. 912 F.2d 1162. In doing so, the Court found the following factors to all support abstention: (1) resolution of claims in state court would favorably affect the efficient administration of the estate; (2) state law issues predominated over bankruptcy issues; (3) the existence of prior litigation of those issues which had already begun in state court; (4) the lack of federal jurisdiction basis other than bankruptcy jurisdiction for the state claims; (5) the case was a related rather than core proceeding; (6) the ease of permitting completion of the state court litigation while reserving the judgment's enforcement to the bankruptcy court; and (6) the right to a jury trial in state court. *Id.* at 1169.

**B.** **The twelve factors for lifting a stay**

Courts have identified twelve nonexclusive factors a bankruptcy court should weigh in determining whether the stay should be lifted to allow a creditor to continue pending litigation in a non-bankruptcy forum. Those twelve factors are:

1. Whether the relief will result in a partial or complete resolution of the issues;

2. The lack of connection or interference with the bankruptcy case;

3. Whether the foreign proceeding involves the debtor as a fiduciary;

4. Whether a specialized tribunal has been established to hear the particular cause of action and whether that tribunal has the expertise to hear such cases;

5. Whether the debtor's insurance carrier has assumed full financial responsibility for defending the litigation;

6. Whether the action essentially involves third parties, and the debtor functions only as a bailee or conduit for the goods or proceeds in question;

7. Whether the litigation in another forum would prejudice the interests of other creditors,

Page 4 of 9

the creditors' committee and other interested parties;

8.    Whether the judgment claim arising from the foreign action is subject to equitable subordination under Section 510(c);

9.    Whether movant's success in the foreign proceeding would result in a judicial lien avoidable by the debtor under Section 522(f);

10.    The interests of judicial economy and the expeditious and economical determination of litigation for the parties;

11.    Whether the foreign proceedings have progressed to the point where the parties are prepared for trial; and

12.    The impact of the stay on the parties and the "balance of hurt."

*In re Sonnax Indus., Inc.*, 907 F.2d at 1285.

All twelve factors are not relevant or applicable in every case. *Id.* at 1286. Nor is a court required to give each factor equal weight when making its determination. *In re Burger Boys, Inc.*, 183 B.R. 682, 688 (S.D.N.Y. 1994).

### C.    *Application of the twelve factors*

As an initial matter, the third, fourth, fifth, sixth, eighth, and ninth factors do not apply here. The remaining factors weigh heavily in favor of granting the Movant relief from the stay. Under the first factor, allowing the Movant to proceed in the state court litigation will likely result in a complete resolution of the issues with regard to the Movant's claim and status as a creditor. It would also establish the factual basis for this Court to determine whether or not Movant's claims are dischargeable.

Under the second factor, it does not appear that the state court litigation would interfere with or prolong the Debtor's chapter 13 case, which was only filed last week. Rather, by allowing the state court to liquidate and characterize the claims against the Debtor, the chapter 13 case will move more quickly. Movant does intend, however, to determine whether there is a basis to seek the dismissal of this bankruptcy case.

The seventh factor is also favorable to lifting the stay because doing so would not prejudice the interests of other creditors or interested parties. Allowing the state court litigation to move forward to its conclusion will likely resolve the Movant's claim to the Debtor's estate, either by settlement or by reducing said claims to judgment. Continuing the automatic stay, however, will result in a duplication of effort and a waste of judicial resources as the Movant's claims would have to be adjudicated to a final resolution and liquidated in bankruptcy court. Movant would essentially be required to retry its entire case again.

Under the tenth and eleventh factors, the state court litigation is substantially underway. By the time these motions are heard, the parties will have been in trial for six days. Key witnesses will have

testified. A number of jurors will have devoted a significant portion of their time listening to the evidence. State law concepts of negligence, breach of contract, fraud, piercing the corporate veil, negligent misrepresentation, conspiracy, unfair and deceptive trade practices and fraudulent transfers are at play. Judicial economy and efficiency weigh in favor of allowing the action to proceed.

Under the twelfth factor, the "balance of hurt" weighs heavily in favor of lifting the stay for the Movant. Lifting the stay would do little to no harm to the Debtor as he is prepared for trial and represented by counsel. Continuing the stay would force the parties to relitigate state court issues and claims in bankruptcy court, and would drastically increase expenses for all parties involved. The Debtor's bankruptcy case, if allowed to proceed, will likely involve dozens of creditors. Movant would be substantially prejudiced if it was forced to litigate its claims in bankruptcy court.

Based on the factors noted above, the Movant has established sufficient cause for relief from the stay. Failure to lift the stay in this case would result in an undue burden on the Movant, and would be an inefficient use of judicial resources. It would require this Court to spend at least two weeks conducting a bench trial on the same issues which Judge Hoover is overseeing at this moment.

### D.   Abstention

The Court should abstain from the state court litigation pursuant to 28 U.S.C. § 1334(c)(1) or (c)(2).

#### i.   Mandatory.
In its simplest form, mandatory abstention prevents federal courts from hearing non-core matters that can be timely adjudicated in a pending state court action. *See In re Mercer's Enters., Inc.*, 387 B.R. 681, 684 (Bankr. E.D.N.C. 2008). Requests for mandatory abstention must arise by motion of a party and may not be raised *sua sponte* by the court. Because mandatory abstention strips a bankruptcy court of its power to adjudicate a claim over which it possesses federal subject matter jurisdiction, the doctrine may only be invoked if six elements are satisfied:

(1)      a party has timely submitted a motion to abstain;

(2)      the cause of action is based upon a state law claim;

(3)      the action is a non-core proceeding (i.e. the action is "related to" the bankruptcy proceeding but does not "arise in" or "arise under" a Title 11 case);

(4)      the bankruptcy court would not otherwise have jurisdiction over the action outside of Section 1334;

(5)      the action was already pending in state court when the bankruptcy case was filed; and

(6)      the action may be timely adjudicated in the state court.

*See In re Constr. Supervision Servs., Inc.*, Ch. 11 Case No. 12-00569-8-RDD, Adv. No. 12-00111-8-RDD, 2012 WL 2993891, at 3 (Bankr. E.D.N.C. July 20, 2012); *In re Mercer's Enters., Inc.*, 387 B.R. at 684. Movant believes that each of these elements are satisfied.

Page 6 of 9

This Motion is timely. The state court litigation is based upon state law claims or causes of action. All of the parties to the state court litigation are North Carolina companies, and as such the state court litigation could not have been commenced in federal court. The state court litigation was pending when the Debtor's bankruptcy was filed, and as the jury trial is currently underway the action may be timely adjudicated in state court. As evidenced by the third prong of the mandatory abstention test and the structure of permissive abstention, Section 1334(c) must be read in conjunction with 28 U.S.C. § 157(b), which delineates the distinction between core and non-core claims. This seemingly artificial divide between categories of bankruptcy actions arose in response to the Supreme Court's decision in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982), which stated that judicial power could only be vested in an independent judiciary protected by Article III safeguards. In other words, because bankruptcy judges did not qualify as Article III judges, Congress did not have the power to grant them broad jurisdiction over state-created private rights of action arising independent from the bankruptcy proceeding. Faced with this holding, Congress passed the Bankruptcy Amendments and Federal Judgeship Act of 1984, which identified two categories of bankruptcy proceedings—core and non-core—in an effort to amend the bankruptcy court's jurisdictional reach.

Core proceedings encompass those claims that are directly related to the bankruptcy court's central functions. These claims must either "arise in" or "arise under" a Title 11 case. *See* 28 U.S.C. § 157(b). To be considered a core proceeding, the claim must not be able to exist in law in the absence of the Bankruptcy Code. Thus, a proceeding is core only if it invokes a substantive right created by federal bankruptcy law. All core proceedings may be heard by a bankruptcy judge, who possesses authority to enter final judgment on the merits.

On the other hand, a claim is considered non-core if it is simply related to the underlying bankruptcy case. *See* 28 U.S.C. § 157(c). A proceeding is related to a bankruptcy case if the outcome of the action could conceivably have an effect on the administration of the bankruptcy estate. A non-core claim thus exists outside the bankruptcy action and is one that can be asserted in the absence of the Bankruptcy Code. A non-core claim, however, may not be finally adjudicated by the bankruptcy court absent the parties' consent. Rather, barring consent the bankruptcy judge may only submit proposed findings of fact and conclusions of law to the district court for review. Movant's state court claims are able to exist outside bankruptcy law and deal with substantive rights that are not created by federal bankruptcy law. Thus, those claims are non-core.

    *ii.*    *Permissive.* To the extent the Court finds that any of the mandatory abstention elements are not satisfied, Section 1334(c)(1) provides that a bankruptcy court *may abstain* from hearing a particular proceeding "in the interest of justice, or in the interest of comity with State courts or respect for State law." The factors considered by courts in determining permissive abstention under § 1334(c)(1) include:

(1) the court's duty to resolve matters properly before it;

(2) the predominance of state law issues and non-debtor parties;

(3) the economical use of judicial resources;

(4) the effect of remand on the administration of the bankruptcy estate;

(5) the relatedness or remoteness of the action to the bankruptcy case;

(6) whether the case involves questions of state law better addressed by the state court;

(7) comity considerations;

(8) any prejudice to the involuntarily removed parties;

(9) forum non conveniens;

(10) the possibility of inconsistent results;

(11) any expertise of the court where the action originated; and

(12) the existence of a right to a jury trial.

*See Blanton v. IMN Fin. Corp.*, 260 B.R. 257, 265 (M.D.N.C. 2001).

In analyzing the above factors, they predominantly weigh in favor of permissive abstention, First, under *Stern v. Marshall*, 131 S.Ct. 2594 (2011), it appears that this Court lacks the authority to enter a final order or judgment on Movant's claims such that it would be required to submit proposed findings of fact and conclusions of law to the District Court for its review and issuance of a final order or judgment. *See Stern*, 131 S.Ct. at 2620 ("The Bankruptcy Court below lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim."). Movant has not filed a proof of claim in the Debtor's case. Given this court's lack of constitutional authority to enter a final order or judgment concerning the issues in the state court litigation, it appears that it would be more economical and expeditious for it to be heard by the state court.

In addition, because this case presents only non-core issues of state law, abstention will not have a significant effect on the administration of the bankruptcy estate. Movant has demanded a jury trial, and this is more appropriately conducted in state court.

## REQUESTS FOR AN EXPANSION OF THE STAY TO NON-DEBTOR PARTIES SHOULD BE DENIED

Upon information and belief, the Debtor may ask this Court to extend the stay to his related corporations which are also defendants in the state court litigation. It has long been the black letter law that the stay only protects the person or entity that files a bankruptcy petition. To the extent that a) a judgment is entered in state court against any non-debtor entity, and b) such judgment has a detrimental impact on the bankruptcy estate, this Court has the ability to fashion appropriate relief in the form of oversight.

On September 25, 2018, SMS filed Adversary Proceeding 18-31436 requesting an injunction and an extension of the stay to SMS. SMS has not requested a hearing on the request for injunctive relief, and the issues in the SMS adversary are therefore not before the Court.

Page 8 of 9

## REQUEST FOR WAIVER OF TEN-DAY STAY PERIOD

Rule 4001(a)(3) of the Federal Rules of Bankruptcy Procedure provides: "An order granting a motion for relief from an automatic stay made in accordance with Rule 4001(a)(1) is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 4001(a)(3). The Movant requests that any order granting the Movant relief from the automatic stay be effective immediately and that the 10-day stay period under Rule 4001(a)(3) be waived, so that the parties may continue the state court litigation immediately.

## CONCLUSION

For the foregoing reasons, the Movant respectfully requests entry of an order granting this Motion, providing the Movant relief from the automatic stay to pursue all claims in the state court litigation, including alter ego and veil piercing claims, or alternatively abstaining from such litigation, and for such other and further relief as may be just and proper.

This 27th day of September, 2018.

THE HENDERSON LAW FIRM, PLLC


/s/ James H. Henderson
James H. Henderson
State Bar No. 13536
1201 Harding Place
Charlotte NC 28202-2826
Telephone: 704.333.3444
Facsimile:  704.333.5003
Email: henderson@title11.com

FILED & JUDGMENT ENTERED
Steven T. Salata

October 31 2018

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

*Laura T Beyer*
Laura T. Beyer
United States Bankruptcy Judge

Exhibit G

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

In Re:                          )
                                )
    VINROY W. REID              )       Case No. 18-31436
                                )       Chapter 13
              Debtor            )

---

## ORDER CONDITIONALLY GRANTING RELIEF FROM STAY

THIS MATTER came before the Court on October 2, 2018 on the following matters: i) the Emergency Motion for Relief from Automatic Stay for Order Allowing Creditor Y2 Yoga Cotswold, LLC to Proceed with State Court Litigation and Motion for Mandatory or Permissive Abstention ("Motion for Relief") [Doc. 6 (filing date September 27, 2018)]; ii) the Debtor's Motion to Extend Automatic Stay ("Motion to Extend") [Doc. 7 (filing date September 27, 2018)]; iii) the Motion of Spend Management Solutions, LLC (for Preliminary Injunction [Doc. 9 (filing date September 27, 2018)] ("SMS Motion"); iv) the Supplemental Emergency Motion for Relief from Automatic Stay for Order Allowing Creditor Y2 Yoga Cotswold, LLC to Proceed with State Court Litigation; Motion for Mandatory or Permissive Abstention, Response to Debtor's Motion to Extend Automatic Stay to Non-Debtor Entities Owned 100% by Debtor, Motion to Show Cause as to Debtor's Eligibility for Chapter 13 Relief, Motion to Dismiss or Strike Petition ("Supplemental Motion") [Doc. 17 (filing date September 28, 2018)]; and v) the Debtor's Response and Request for Hearing [Doc. 22 (filing date October 1, 2018)] (collectively the "Motions"). All of the Motions were heard pursuant to orders allowing the time periods for the notices of hearing to be shortened.

Based on the pleadings and the arguments of counsel for Y2 Yoga Cotswold, LLC ("Movant"), the Debtor and Spend Management

Solutions, LLC ("SMS"), the Court makes the following findings of fact:

1.    As of the time the Motions were filed and as of the date of the hearings, a jury trial was being conducted in Mecklenburg County by Superior Court Judge Donnie Hoover concerning a complaint filed by Movant in 2016. The defendants in the pending state court litigation include the Debtor, three corporate entities related to the Debtor, and one corporate entity which is not related to the Debtor. The factual basis for Movant's state court complaint, involving a construction project, is described in more detail in Movant's Second Amended Verified Complaint (the "Complaint") attached to the Motion for Relief as Exhibit A.

2.    Movant's claims for relief in the state court litigation include (but are not limited to) non-core breach of contract, fraud, fraudulent transfers, alter ego, piercing the corporate veil, conversion, unfair and deceptive trade practices and breach of fiduciary duty.

3.    All parties have extensively prepared for the state court trial. The Debtor filed his bankruptcy petition on Friday, September 21, 2018, after all jurors (except two alternates) had been selected. Judge Hoover allowed the trial to proceed with the Debtor acting only in the capacity of a fact witness, pending a ruling by this Court on the Motion for Relief. Judge Hoover stated that the trial would go forward, but that due to the automatic stay in bankruptcy, the Plaintiff should not proceed to judgment against Mr. Reid as long as he was protected by the automatic stay. As of the hearing date, the state court jury had heard five days of witness testimony.

4.    Movant sought in its Motion an Emergency Order allowing Superior Court Judge Hoover to proceed with the jury trial as to all parties, including the Debtor, and to enter final judgment as to all parties with respect to all issues in the Complaint.

5.    After the hearing on the Motions, Movant indicated that it would withdraw the Supplemental Motion.

Based on the forgoing finding of fact, the Court makes the following Conclusions of Law:

6.    Pursuant to 28 U.S.C. §§ 157 and 1334, this Court has jurisdiction over this matter, which is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G).

7.    The stay operates to protect a debtor from his creditors, and all post-petition actions taken against a debtor are violations of the stay. *Grady v. A.H. Robins Co.*, Inc., 839 F.2d 198, 200 (4th

Cir. 1988). Although the stay is an important protection for a debtor, its application in a particular case is not beyond the discretion and authority of the court. Section 362(d)(1) provides that the bankruptcy court shall grant relief from the stay for "cause." 11 U.S.C. § 362(d)(1). The Bankruptcy Code does not define cause; instead, it is determined by the court on a case-by-case basis. *Claughton v. Mixson*, 33 F.3d 4, 5 (4th Cir. 1994); *Ivester v. Miller*, 398 B.R. 408, 425 (M.D.N.C. 2008).

8.    In determining whether the relief sought in the Motion for Relief should be granted, this Court is bound by the Fourth Circuit's decision in *Robbins v. Robbins (In re Robbins)*, 964 F.2d 342 (4th Cir. 1992). The *Robbins* court articulated three factors that could be considered in determining if cause existed to annul the automatic stay. The Fourth Circuit stated in *Robbins* that "factors that courts consider in deciding whether to lift the automatic stay include": (1) whether the case involves only state law so that the expertise of the bankruptcy court is unnecessary; (2) whether modifying the stay will promote judicial economy and whether there would be greater interference with the bankruptcy case if the stay were not lifted because matters would have to be litigated in the bankruptcy court; and (3) whether the estate can be protected properly by a requirement that creditors seek enforcement of any judgment through the bankruptcy court. *Robbins*, 964 F.2d at 345.

9.    As to the first factor, the Complaint clearly concerns issues of state law and the expertise of this Court is not necessary.

10.    As to the second factor, modifying the stay will promote judicial economy. Continuing the stay as to the state court litigation with create substantial delay, as the trial on the Complaint as to the Debtor would essentially have to start all over again. The jury is already empaneled and hearing testimony. For these same reasons, there would be greater interference with the bankruptcy case if the stay were not lifted.

11.    As to the third factor, this Court can properly protect the bankruptcy estate by requiring that the enforcement of any judgment in favor of Movant will be solely within the jurisdiction of this Court.

12.    Nothing herein shall prevent the Debtor and/or the defendant entities related to him from challenging any lien, inchoate or otherwise, asserted by the Plaintiff/Movant.

IT IS THEREFORE ORDERED:

1.    Movant's Motion for Relief should be and hereby is

granted for the purpose of allowing Movant to determine its claims, if any, in the state court litigation, and Movant's withdrawal of the Supplemental Motion is allowed;

    2.    The Debtor's Motion to Extend is denied;

    3.    The SMS Motion is denied as being moot;

    4.    To the extent that Movant obtains a judgment against the Debtor or any of the other defendants, Movant is required to seek enforcement of such judgment through this Court; and

    5.    This Order is effective immediately and the 10-day stay period under Rule 4001(a)(3) is waived.

This Order has been signed    United States Bankruptcy Court
electronically.  The Judge's
signature and court's seal
appear at the top of the Order.

IN THE UNITED STATES BANKRUPTCY COURT FOR THE WESTERN DISTRICT

OF NORTH CAROLINA CHARLOTTE DIVISION

| | | |
|---|---|---|
| IN RE:  VINROY W. REID | ) | |
| | ) | CHAPTER 13 CASE NO.: 18-31436 |
| DEBTOR | ) | |
| Y2 YOGA COTSWOLD, LLC | ) | ADV. PROC. NO.: 19-03049 |
|       Plaintiff | ) | |
| V. | ) | |
| VINROY W. REID,  V.R. KING | ) | |
| CONSTRUCTION, LLC | ) | |
| A. BURTON SHUFORD | ) | |

**CERTIFICATE OF SERVICE**

The undersigned certifies that on the 29th day of May, 2020, she served the attached Memorandum of Law on the following parties via ECF only:

Shelley K. Abel, U.S. Bankruptcy Administrator, James H. Henderson, Counsel for Y2 Yoga Cotswold, LLC, Robert Lewis, Jr. Counsel for VR King Construction, LLC. and A. Burton Shuford Trustee for Vinroy W. Reid and VR King Construction, LLC and Attorney for the Trustee.

     She further represents that she served the Defendant, Vinroy W. Reid via e-mail at: **vinroyreid8@gmail.com**

                               **BY: /s/: Verna Bash-Flowers**

                               ATTORNEY FOR VINROY W. REID
                               Verna Bash-Flowers
                               N.C. State Bar No: 38937
                               P.O. Box 927
                               Lowell, NC 28098
                               704-691-7220 (Phone)
                               877-261-2710 (Fax)
                               vnclaw.bashflowers@outlook.com